**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREW J. ORKIN; F. MARK ORKIN;
SARAH-ROSE JOSEPHA ADLER; A.
HEINRICH ZILLE,
        *Plaintiffs-Appellants,*

v.

ELIZABETH TAYLOR,
        *Defendant-Appellee.*

No. 05-55364

D.C. No.
CV-04-08472-RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
February 12, 2007—Pasadena, California

Filed May 18, 2007

Before: William C. Canby, Jr. and Sidney R. Thomas,
Circuit Judges, and Suzanne B. Conlon,* District Judge.

Opinion by Judge Thomas

*The Honorable Suzanne B. Conlon, Senior United States District
Judge for the Northern District of Illinois, sitting by designation.

**COUNSEL**

Thomas J. Hamilton, Byrne Goldberg & Hamilton, PLLC, Washington, DC, for the appellants.

Steven Alan Reiss, Weil, Gotshal & Manges, LLP, New York, New York, for the appellee.

**OPINION**

THOMAS, Circuit Judge:

Descendants of Jewish art collector Margarete Mauthner (collectively, "the Orkins") claim that their ancestor was

wrongfully dispossessed of a painting during Hitler's Nazi regime, entitling them to ownership of the painting, which was later purchased by actress Elizabeth Taylor. In this appeal, we conclude that the Holocaust Victims Redress Act does not create a private right of action and that the Orkins' state law claims are barred by the statute of limitations. We affirm the judgment of the district court, dismissing the complaint.

I

Vincent van Gogh is said to have reflected that "paintings have a life of their own that derives from the painter's soul." The confused and perhaps turbulent history of his painting *Vue de l'Asile et de la Chapelle de Saint-Rémy* may prove the truth of his observation.

In 1889, a few months after cutting off the lower part of his left ear following a dispute with Paul Gauguin, van Gogh entered the Saint-Paul-de-Mausole asylum near the town of Saint-Rémy-de-Provence. During this period of his life, he produced over 150 paintings, including some of his most famous works, such as *The Starry Night*. In the summer or fall of 1889, he painted *Vue de l'Asile et de la Chapelle de Saint-Rémy*, which may have been part of a series that he described to his brother Theo as "Sketches of Autumn." The painting portrays either the Church of Labbeville near the town Auvers, a few miles from the asylum, or a monastery which was part of the asylum. Within a year of completing the painting, van Gogh died from a self-inflicted gunshot wound.

Van Gogh sold only one painting during his lifetime. Since his death, however, his works have indeed had lives of their own. After Vincent's death in 1890, and his brother Theo's death six months later, ownership of *Vue de l'Asile et de la Chapelle de Saint-Rémy* passed to Theo's widow, Johanna. The German art dealer Paul Cassirer, an early promoter of the works of van Gogh and other post-impressionist artists, pur-

chased the painting in 1906 or 1907. Shortly thereafter, Cassirer sold the picture to Margarete Mauthner, an early collector of van Gogh's works. The parties vigorously dispute the circumstances under which Mauthner parted with the painting, and that dispute forms the basis of the current controversy between the parties. We need not, and we do not, resolve those factual disputes in this appeal because the issues before us are purely legal in nature. However, a description of the general factual background of the case — highlighting where appropriate the factual disputes — is helpful to frame the legal issues presented.

One of the tools used by art historians to trace ownership is an artist's *catalogue raisonné*. A *catalogue raisonné* is an annotated, illustrated book of a particular artist's works, usually prepared by art historians, scholars, and dealers, which constitutes "a definitive listing and accounting of the works of an artist." *DeWeerth v. Baldinger*, 836 F.2d 103, 112 (2d. Cir. 1987). A *catalogue raisonné* published in 1928, *L'oeuvre de Vincent Van Gogh Catalogue Raisonné*, shows Margarete Mauthner as the owner of the painting. J.B. de la Faille's *catalogue raisonné* of van Gogh, published in 1939, also identifies Mauthner as the owner.

From the time of Adolf Hitler's election as Chancellor of Germany in 1933 until the end of World Ward II, Hitler's Nazi regime engaged in a systematic effort to confiscate thousands of works of art throughout Europe. Hector Feliciano, *The Lost Museum: The Nazi Conspiracy to Steal the World's Greatest Works of Art* 3 (Basic Books 1997). Within Germany, the enactment of the Ordinance for the Attachment of the Property of the People's and State's Enemies and the Ordinance for the Employment of Jewish Property gave Nazi officials the authority to seize artwork from Jewish owners under color of law. Jonathan Petropoulos, *Art as Politics in the Third Reich*, 190 (University of North Carolina Press 1996).

As the Nazis' persecution accelerated, Mauthner fled Germany to South Africa in 1939, leaving her possessions behind. She remained there until her death in 1947, at the age of 84. What happened to *Vue de l'Asile et de la Chapelle de Saint-Rémy* during that time is not clear from the record. A 1970 *catalogue raisonné* prepared by a committee of scholars in the Netherlands lists the next owner as Alfred Wolf, a Jewish businessman who left Germany for Switzerland in 1934 and ultimately relocated to South America. The auction catalogue prepared by Sotheby & Co. in 1963 lists the provenance, or chain of title, as including three owners prior to Wolf. The Sotheby's catalogue traces the ownership of the painting from Mauthner to Paul Cassirer, to Marcel Goldschmidt, and then to Alfred Wolf. The Orkins contend that this chain of ownership cannot be correct because Paul Cassirer had committed suicide in 1926, two years before the 1928 *catalogue raisonné* was published, listing Mauthner as the owner.

Notably, the Orkins do not contend that the painting was confiscated by the Nazis. Rather, they allege economic coercion, contending that Mauthner sold the painting "under duress." They note that laws promulgated by the Allied Forces after the conclusion of World War II established a presumption that any transfer or relinquishment of property by a persecuted person within the period January 30, 1933 to May 8, 1945 was an act of confiscation. Military Government Law No. 59 § 375(b).

Taylor contends that, at best, the record shows that the painting was sold through two Jewish art dealers to a Jewish art collector, with no evidence of any Nazi coercion or participation in the transactions.

In short, the parties agree that Mauthner once owned the painting, and it was later possessed by Alfred Wolf. At this point in the development of the case, the rest of what transpired with the painting during the 1930's in Berlin is clouded

in uncertainty. Sometime in the early 1960s, the Estate of Alfred Wolf commissioned Sotheby's to sell by auction a number of Impressionist and Post-Impressionist paintings, including *Vue de l'Asile et de la Chapelle de Saint-Rémy*.

With the help of her father, who was an art dealer, Elizabeth Taylor began collecting art in the 1950s, acquiring works of Degas, Renoir, Pissarro, Monet, Cassatt and other prominent artists. She had long wanted to acquire a van Gogh. While living in London with her husband, Richard Burton, Taylor learned that *Vue de l'Asile et de la Chapelle de Saint-Rémy* would be offered at a Sotheby's auction in April 1963. She authorized her father to bid for her at the auction, and he was successful in purchasing the painting on her behalf for £ 92,000.

Taylor's acquisition was publicized at the time. Subsequently, the 1970 *catalogue raisonné* referenced Taylor's ownership. From November 1986 until March 1987, the painting was exhibited publicly at the Metropolitan Museum of Art in New York, in an exhibition entitled *Van Gogh in Saint Rémy and Auvers*.

In 1990, Taylor offered the painting for sale through Christie's auction house in London. The provenance for the sale lists Taylor as the current owner, with the prior owners being Alfred Wolf (of Stuttgart and Buenos Aires), Marcel Goldschmit & Co. (of Frankfurt), Margarete Mauthner (of Berlin), Paul Cassirer (of Berlin), and Johanna van Gogh-Bonger (of Amsterdam). The work did not sell at the auction.

In 1998, Congress enacted three statutes pertaining to victims of Nazi persecution: the Holocaust Victims Redress Act ("Act"), Pub. L. No. 105-158, 112 Stat. 15 (1998), the Nazi War Crimes Disclosure Act of 1998, Pub. L. No. 105-167, 114 Stat. 2865 (1998), and the United States Holocaust Assets Commission Act of 1998, Pub. L. No. 105-186, 112 Stat. 611 (1998). The Orkins allege that their inquiry into whether their

ancestor, Mauthner, may have lost her art collection due to Nazi persecution began upon the passage of these acts. They retained a law firm in 2001 and claim that, until their attorneys completed their investigation, they did not discover the basis of their current claim. The Orkins allege that, before they began that investigation, they did not know that Mauthner had owned *Vue de l'Asile et de la Chapelle de Saint-Rémy*, that she had lost the painting as a result of Nazi persecution, that Taylor had bought the painting, or that there was a legal basis for recovering the painting. They also claim that they first learned of Taylor's ownership in 2002, through a rumor on the internet that Taylor was interested in selling the painting.

In December 2003, the Orkins wrote a letter to Taylor, demanding that she return the painting to them. After some discussion of settlement, Taylor wrote a response letter declining settlement and asserting that the Orkins' claim to the painting was untimely. Taylor then filed a complaint for declaratory relief to establish her title.

In 2005, the Orkins filed their First Amended Complaint for recovery of the painting under theories of specific recovery, replevin, constructive trust, restitution, and conversion. The district court dismissed the complaint, concluding that the state-law actions were time-barred and that the federal statute did not create a private right of action. Because there is complete diversity between the parties and because the painting is worth more than $75,000, the district court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291, and we review *de novo* the district court's dismissal of the complaint pursuant to Rule 12(b)(6). *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003).

Because the district court dismissed this case on a Rule 12(b)(6) motion, we must assume that all facts stated in the complaint are true and that they are provable by admissible evidence. Although the parties vigorously dispute whether the

painting was effectively confiscated by the Nazis through forced sale or was legitimately sold through Jewish art dealers, we need not resolve that issue. We assume, for the purposes of our discussion, that the allegations of the complaint are true, and that Mauthner was coerced into giving up the painting before she left Germany.

## II

**[1]** The district court properly dismissed the Orkins' federal claims on the ground that the Holocaust Victims Redress Act did not create a private right of action against private art owners. In determining whether a federal statute creates a private right of action, congressional intent is the cornerstone of the analysis. The Supreme Court has established a four-factor test for discerning whether a statute creates a private right of action. *Cort v. Ash*, 422 U.S. 66 (1975). Under that test, we must ask: (1) whether the plaintiff is a member of a class that the statute especially intended to benefit, (2) whether the legislature explicitly or implicitly intended to create a private cause of action, (3) whether the general purpose of the statutory scheme would be served by creation of a private right of action, and (4) whether the cause of action is traditionally relegated to state law such that implication of a federal remedy would be inappropriate. 422 U.S. at 78.

**[2]** The most important inquiry under *Cort* is the second factor: whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Opera Plaza Residential Parcel Homeowners Assn. v. Hoang*, 376 F.3d 831, 834-35 (9th Cir. 2004) (quoting *Cort*, 422 U.S. at 78); *First Pacific Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121-22 (9th Cir. 2000) (same). Indeed, the three *Cort* questions that are not explicitly focused on legislative intent are actually indicia of legislative intent, such that the *Cort* test itself is focused entirely on intent. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76 (1979). The four *Cort*

factors, thus, are merely targeted inquiries to guide our central project of discerning Congress's intent. *Id.*

**[3]** The plain text of the Holocaust Victims Redress Act leaves little doubt that Congress did not intend to create a private right of action. The Orkins rely on § 202 of the Act, entitled "Sense of the Congress Regarding Restitution of Private Property, Such as Works of Art." That section reads in its entirety as follows:

> It is the sense of the Congress that consistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner.

Act § 202, 112 Stat. at 17-18.

**[4]** "Sense of the Congress" provisions are precatory provisions, which do not in themselves create individual rights or, for that matter, any enforceable law. *Yang v. Cal. Dept. of Soc. Servs.*, 183 F.3d 953, 958-59 (9th Cir. 1999). Although "sense of the Congress" provisions are sometimes relevant to our determination of whether other mandatory provisions create private rights of action, *id.* at 959 & n.4, the Orkins can point to no provision of the Act or of any of its companion legislation that can fairly be characterized as mandatory. There is simply no "right- or duty-creating language" anywhere in the statutory scheme, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979), and § 202's announcement of a "sense of the Congress" cannot, of its own force, imply a private right of action, *Yang*, 183 F.3d at 958-59.

**[5]** Additionally, the Act's legislative history indicates that even its most ardent supporter did not intend for the bill to

create a private right of action. Rather, the legislative intent was to encourage state and foreign governments to enforce existing rights for the protection of Holocaust victims. The sponsor and primary champion of the legislation, Representative Jim Leach (R-IA), believed that existing law would suffice to restitute Nazi-stolen artworks to their Nazi-era owners. At a hearing that occurred after passage of the Act, Representative Leach noted the possibility that new "domestic legislation" might assist in restitution of stolen art, but he went on to conclude that "Congress may have gone as far as it appropriately should on this subject in the Holocaust Victims Redress Act." *Holocaust Victims' Claims, Hearing before the House Committee on Banking and Financial Services*, 105th Cong., 2d Sess. (1998). That statement strongly implies, consistently with the precatory language of the legislation itself, that the Act was a limited bill, passed with an understanding of constitutional limitations on congressional power. The second *Cort* factor, thus, does not support the Orkins' claim; the bill simply did not intend to create a private right of action.

**[6]** Examination of the remaining *Cort* factors buttresses this conclusion. With respect to the first *Cort* factor, although there is no doubt that the Act was focused on Holocaust victims and (in a colloquial sense) intended to benefit them, Holocaust victims do not constitute a "beneficiary class" within the meaning of the *Cort* test. The provision's focus is on "governments" rather than individuals, urging those governments "to facilitate" enforcement of preexisting property rights. Act § 202, 112 Stat. at 17-18. The statute, thus, does not "explicitly confer[ ] a benefit on" Holocaust victims; it merely expresses Congress's sense that Holocaust survivors and heirs should benefit fully from preexisting protections. *Cf. Cannon*, 441 U.S. at 693-94 (concluding that the first *Cort* factor was met because the statute at issue "explicitly confers a benefit on" an identifiable class and because the plaintiff was a member of that class). The Orkins, thus, are not members of a class that Congress "intended to benefit," as that phrase is used in *Cort*.

**[7]** With respect to the third *Cort* factor, the text and history of the legislation reveal that its overarching purpose was not to provide for private litigation. Rather, the general purpose of the statutory scheme was to fund research efforts and to declassify records, while simultaneously encouraging foreign governments, as well as public and private institutions, to do likewise. In other words, the motivating concern was *not* access to courts; it was access to information. In fact, throughout the committee hearings, witnesses testified that courts would likely do a poor job of resolving Holocaust victims' claims. Specifically, the committee heard testimony that the difficulties of tracing information would likely preclude effective judicial resolution of discrete claims, and several museum directors testified that alternative fora such as mediation and arbitration were preferable to litigation. *Holocaust Victims' Claims, Hearing before the House Committee on Banking and Financial Services*, 105th Cong., 2d Sess. (1998) (testimony of Philippe de Montebello, director of the Metropolitan Museum of Art). The general purposes of the statute, therefore, do not support the conclusion that Congress intended to provide a private right of action in this case.

**[8]** Finally, with respect to the fourth *Cort* factor, there can be no doubt — as this case amply demonstrates — that state law provides causes of action for restitution of stolen artworks. Furthermore, the torts asserted here are undoubtedly causes of action that are traditionally relegated to state law. Implication of a federal remedy in this case, therefore, would be inappropriate under the fourth *Cort* factor. Representative Leach's statement that "Congress may have gone as far as it appropriately should" when it passed the Act strongly supports the conclusion that Congress did not intend to supersede traditional state-law remedies when it passed the Act. *Holocaust Victims' Claims, Hearing before the House Committee on Banking and Financial Services*, 105th Cong., 2d Sess. (1998).

**[9]** In short, the Act does not satisfy any of the *Cort* factors; none of the relevant indicia of intent supports the conclusion

that Congress intended to create an implied private right of action in this case. The Act is a precatory announcement of the "sense of the Congress," which neither confers rights nor creates duties. Given the absence of congressional intent to create a private right of action, the Orkins' assertion of a federal right of action must fail.

## III

**[10]** The district court also properly concluded that the Orkins' state-law claims were time-barred. California provides a three-year statute of limitations for any action arising from the "taking, detaining, or injuring" of any "goods or chattels." Cal. Civ. Proc. Code § 338(c). In 1983, the statute of limitations was amended to specify that a "discovery rule" governs accrual of causes of action for recovery of "any article of historical, interpretive, scientific, or artistic significance." *Id.* In other words, under the new law, an action for recovery of artwork accrues when the rightful owner discovers the whereabouts of the artwork. Before 1983, the statute did not specify when a cause of action for theft would accrue.

The Orkins do not argue that the 1983 amendment applies retroactively to their allegations of a 1939 theft and a 1963 conversion. Rather, they contend that the discovery rule applies even under pre-1983 law, citing an intermediate appeals court decision that so held. *Naftzger v. Am. Numismatic Soc'y*, 42 Cal. App. 4th 421 (1996).

"The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Ticknor v. Choice Hotels Intern., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (quoting *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980)). If the state's highest appellate court has not decided the question presented, then we must predict how the state's highest court would decide the question. *Id.* In doing so, we take state

law as it exists without speculating as to future changes in the law. *Id.*

**[11]** The California Supreme Court has never confronted the question of what rule governs accrual of pre-1983 causes of action for theft and conversion. The California Supreme Court has, however, specifically held that the discovery rule, whenever it applies, incorporates the principle of constructive notice. In *Jolly v. Eli Lilly & Co.*, the California Supreme Court held that, under California's discovery rule, "[a] plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." 44 Cal.3d 1103, 1109 (1988). In other words, under the discovery rule, a cause of action accrues when the plaintiff discovered *or reasonably could have discovered* her claim to and the whereabouts of her property. In assessing California law, we conclude that it is highly unlikely that the California Supreme Court would abandon the *Jolly* rule, much less adopt a new rule that eschewed the concept of constructive notice.

**[12]** Under *Jolly*, the latest possible accrual date of the Orkins' cause of action was the date on which they first reasonably could have discovered, through investigation of sources open to them, their claim to and the whereabouts of the van Gogh painting. From the face of the Orkins' complaint, it is apparent that Taylor's acquisition of the painting was certainly discoverable at least by 1990, when she held it out for sale in an international auction, and most probably as early as 1963, when she acquired the painting in a highly publicized international auction. In fact, the complaint alleges — and demonstrates by attachment — that Taylor bought the painting at a publicized auction in 1963, that Taylor was listed as the owner of the painting in a publicly available 1970 *catalogue raisonné*, and that Taylor publicly offered the painting for sale in 1990. Had the Orkins investigated any of those publicly-available sources, they could have discovered

both their claim to the painting and the painting's whereabouts long before the 2002 internet rumor was posted.

**[13]** We therefore affirm the district court's conclusion that the Orkins' state-law claims are time-barred. Even under the most generous possible rule for accrual of the causes of action, the claims expired in or before 1993 — three years after the last public announcement of Taylor's ownership. The district court correctly held that the Orkins' state law claims were untimely filed.

## IV

Congress did not create a private right of action in passing the Holocaust Victims Redress Act, which merely reflected the sense of Congress. The Orkins' state law claims are time-barred. The district court was entirely correct in dismissing the complaint. We need not, and do not, reach any of the other issues urged by the parties.

**AFFIRMED.**