**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAREI VON SAHER,
      *Plaintiff-Appellant,*

v.

NORTON SIMON MUSEUM OF ART AT
PASADENA, Norton Simon Museum
of Art at Pasadena; NORTON SIMON
ART FOUNDATION,
      *Defendants-Appellees.*

No. 07-56691

D.C. No.
CV-07-02866-JFW

ORDER
AMENDING
OPINION AND
DENYING THE
PETITIONS FOR
REHEARING AND
FOR REHEARING
EN BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
December 8, 2008—Pasadena, California

Filed August 19, 2009
Amended January 14, 2010

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge Thompson;
Dissent by Judge Pregerson

## COUNSEL

Lawrence M. Kaye, New York, New York, for plaintiff-appellant Marei Von Saher.

Fred Anthony Rowley, Jr., Los Angeles, California, for defendants-appellees Norton Simon Museum of Art at Pasadena and Norton Simon Art Foundation.

Frank Kaplan, Santa Monica, California, for amicus curiae Bet Tzedek Legal Services, The Jewish Federation Council of Greater Los Angeles, American Jewish Congress, American Jewish Committee, Simon Wiesenthal Center and Commission for Art Recovery.

Edmund G. Brown, Jr., Attorney General of the State of California by Antonette Benita Cordero, Los Angeles, California, for amicus curiae State of California.

## ORDER

The panel, with the following amendments, has granted the petition for panel rehearing filed by the appellee, Norton

Simon Museum of Art at Pasadena, and has denied the petitions for rehearing and for rehearing en banc filed by the appellant Marei Von Saher, and by amici the State of California and Earthrights International.

The opinion filed August 19, 2009, slip op. 11333, and published at 578 F.3d 1016 (9th Cir. 2009) is amended as follows:

At page 578 F.3d 1031 the last two paragraphs of the majority opinion are deleted. The first of these two paragraphs begins "The museum contends that the articles" and the last paragraph of the two paragraphs ends "dismissed without leave to amend." The following new paragraph is inserted in place of the two deleted paragraphs:

> Because it is not clear that Saher's complaint could not be amended to show a lack of reasonable notice, dismissal without leave to amend was not appropriate. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). We, therefore, grant Saher leave to amend her complaint to allege the lack of reasonable notice to establish diligence under California Code of Civil Procedure § 338, and remand this case to the district court for that purpose.

The full court was advised of the petitions for rehearing and for rehearing en banc, and of the proposed amendments set forth above. No judge requested rehearing en banc.

The opinion as amended above is filed simultaneously with this order.

With the exception of the relief granted above pursuant to the appellee's petition for panel rehearing, the petitions for rehearing and for rehearing en banc are DENIED. Judge Pre-

gerson voted to grant the petitions for rehearing and for rehearing en banc.

No further petitions for rehearing or rehearing en banc may be filed.

---

**OPINION**

THOMPSON, Senior Circuit Judge:

Marei von Saher ("Saher") seeks the return of two paintings alleged to have been looted by the Nazis during World War II. The paintings were purchased in or around 1971 by the Norton Simon Museum of Art in Pasadena, California ("the Museum"), and are now on display there. Saher brought this claim against the Museum under § 354.3 of the California Code of Civil Procedure, which extends the statute of limitations until 2010 for actions for the recovery of Holocaust-era art. The primary issue on appeal is whether § 354.3 infringes on the national government's exclusive foreign affairs powers. The district court held that it does. We agree, and affirm the district court's holding that § 354.3 is preempted.

California also has a three-year statute of limitations for actions to recover stolen property. California Code of Civil Procedure § 338. The district court granted the Museum's Rule 12(b)(6) motion to dismiss Saher's complaint under that statute without leave to amend. Because it is possible Saher might be able to amend her complaint to bring her action within § 338, we reverse the district court's dismissal without leave to amend, and remand for further proceedings.

## I.  Background

### A.  *Nazi Art Looting in WWII*

During World War II, the Nazis stole hundreds of thousands of artworks from museums and private collections

throughout Europe, in what has been termed the "greatest displacement of art in human history." Michael J. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 202 (NYU Press 2003).

Following the end of World War II, the Allied Forces embarked on the task of returning the looted art to its country of origin. In July 1945, President Truman authorized the return of "readily identifiable" works of art from U.S. collecting points. *See, e.g.*, Presidential Advisory Commission on Holocaust Assets in the United States, Plunder and Restitution: The U.S. and Holocaust Victims' Assets SR-142 (Dec. 2000) (hereinafter Plunder and Restitution). At the Potsdam Conference, President Truman formally adopted a policy of "external restitution," under which the looted art was returned to the countries of origin—not to the individual owners. American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, Report, 148 (1946) (hereinafter Roberts Commission Report).

Despite these restitution efforts, many paintings stolen by the Nazis were never returned to their rightful owners. *See, e.g.*, Bazyler at 204. Tracking the provenance of Nazi-looted art is nearly impossible, since many changes of ownership went undocumented, and most of the transactions took place on the black market. *Id.* In recent years, a number of the world's most prominent museums have discovered their collections include art stolen during World War II. *Id.* at 205-06.

The federal government has continued to take action to address the recovery of Holocaust-era art. In 1998, Congress enacted the U.S. Holocaust Assets Commission Act of 1998, Pub. L. No. 105-186, 112 Stat. 611 (codified as amended at 22 U.S.C. § 1621). This Act established the Presidential Advisory Commission on Holocaust Assets, which conducted research on the fate of Holocaust-era assets, and advised the President on future policies concerning the recovery of these assets. *Id*. That same year, the State Department convened a

conference with forty-four other nations to address the recovery of Holocaust-era assets. U.S. Dep't of State, Proceedings of the Washington Conference on Nazi-Confiscated Art (Dec. 3, 1998), http://www.state.gov/p/eur/rt/hlcst/23231.htm (hereinafter Washington Conference Proceedings). In the meantime, numerous Holocaust victims and their heirs have turned to the courts to recover their looted art. *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677 (2004).

### B.    Section 354.3

Many obstacles face those who attempt to recover Holocaust-era art through lawsuits. The challenges range from procedural hurdles such as statutes of limitations, to prudential standing doctrines. *See, e.g.*, Benjamin E. Pollock, *Out of the Night and Fog: Permitting Litigation to Prompt an International Resolution to Nazi-Looted Art Claims*, 43 Houston L. Rev. 193, 213-28 (2006); Lawrence M. Kaye, *Avoidance and Resolution of Cultural Heritage Disputes: Recovery of Art Looted During the Holocaust*, 14 Williamette J. Int'l L. & Disp. Resol. 243, 252-58 (2006). In 2002, California responded to these difficulties by enacting California Code of Civil Procedure § 354.3.[1] Section 354.3 provides:

> Notwithstanding any other provision of law, any owner, or heir or beneficiary of an owner, of Holocaust-era artwork, may bring an action to recover Holocaust-era artwork from any entity described in paragraph (1) of subdivision (a). Subject to Section 410.10, that action may be brought in a superior court of this state, which court shall have jurisdiction over that action until its completion or resolution.

---

[1] All subsequent references are to the California Code of Civil Procedure, unless otherwise stated.

Section 354.3(b). The California statute allows suits against "any museum or gallery that displays, exhibits, or sells any article of historical, interpretive, scientific, or artistic significance." Section 354(a)(1). The statute also extends the statute of limitations for § 354.3 claims until December 31, 2010. Section 354.3(c).

California has enacted several other laws extending the statute of limitations for claims relating to the Holocaust. *See, e.g.*, Section 354.5 (extending statute of limitations for insurance policy claims by Holocaust victims or their heirs); Section 354.6 (creating a cause of action and extending the statute of limitations for slave labor claims arising out of WWII). Both of these sister statutes have been found unconstitutional under the foreign affairs doctrine. *Steinberg v. Int'l Comm'n on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944, 953 (Cal.Ct. App. 2005) (finding § 354.5 unconstitutional); *Deustch v. Turner*, 324 F.3d 692, 716 (9th Cir. 2003) (finding § 354.6 unconstitutional).

## C.  The Cranachs

Saher, the only surviving heir of Jacques Goudstikker, a deceased art dealer, filed this suit in 2007 against the Museum under § 354.3 and California Penal Code § 496, seeking the return of a diptych entitled "Adam and Eve." The diptych, a pair of oil paintings by sixteenth-century artist Lucas Cranach the Elder (hereinafter the "Cranachs"), is currently on public display at the Museum.

Goudstikker bought the Cranachs at an art auction in Berlin in or about May 1931.[2] Goudstikker was a prominent art dealer in the Netherlands; he specialized in Old Master paint-

---

[2]The facts in this section are alleged in Saher's complaint; some are disputed by the Museum. Given the procedural posture of the case, we accept these factual allegations as true, and construe them in the light most favorable to Saher.

ings. Goudstikker's collection contained more than 1,200 art-works, including Rembrandts, Steens, Ruisdaels, and van Goghs.

When the Nazis invaded the Netherlands in May 1940, Goudstikker and his family fled the country. The family left their assets behind, including the Gallery. Goudstikker brought with him a black notebook containing a list of over 1,000 of the artworks he had left behind in his collection (the "Blackbook"). The Blackbook lists the Cranachs as Numbers 2721 and 2722, and states that they were purchased at the Lepke Auction House and were previously owned by the Church of the Holy Trinity in Kiev.

After the Goudstikkers escaped, the Nazis looted Goudstikker's gallery. Herman Göring, Reischsmarschall of the Third Reich, seized the Cranachs and hundreds of other pieces from the gallery. Göring sent the artwork to Carinhall, his country estate near Berlin, where the collection remained until approximately May 1945 when the Allied Forces discovered it. The recovered artwork was then sent to the Munich Central Collection Point, where the works from the Goudstikker collection were identified. In or about 1946, the Allied Forces returned the Goudstikker artworks to the Netherlands.

The Cranachs were never restituted to the Goudstikker family. Instead, after restitution proceedings in the Netherlands, the Dutch government delivered the two paintings to George Stroganoff, one of the claimants, and he sold them, through an art dealer, to the Museum.

The Museum filed a Rule 12(b)(6) motion to dismiss Saher's complaint filed in this case for the return of the paintings. The district court granted the motion and dismissed Saher's claim with prejudice. The district court held that § 354.3's extension of the statute of limitations was unconstitutional on its face, because it violated the foreign affairs doctrine, as interpreted and applied by the Ninth Circuit in

*Deustch*, 324 F.3d 692. The district court concluded that by seeking to redress wrongs committed in the course of World War II, the California statute intruded on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims. The court then dismissed Saher's complaint because it had not been filed within the three-year period of California's statute of limitations, California Code of Civil Procedure § 338. This appeal followed.

## II.    Standard of Review

We review de novo the district court's decision dismissing Saher's complaint under Rule 12(b)(6). *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004). We accept all well-pleaded factual allegations as true, and construe them in the light most favorable to Saher. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, ___, 127 S. Ct. 1955, 1965 (2007); *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008).

## III.    Motion for Judicial Notice

The Museum moves for judicial notice of two Presidential Commission reports, a military order approved by President Truman and enacted under the command of General Eisenhower, and a memorandum prepared by a State Department committee. Judicial notice of legislative facts such as these is unnecessary. Fed. R. Evid. 201(a), advisory comm. note to 1972 amendments. *See, e.g.*, *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("[J]udicial notice is generally not the appropriate means to establish the legal principles governing the case.").

The Museum also moves for judicial notice of the fact that various newspapers, magazines, and books have published information about the Cranachs. Courts may take judicial notice of publications introduced to "indicate what was in the

public realm at the time, not whether the contents of those articles were in fact true." *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2001); *accord Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.118 (9th Cir. 1999) (taking judicial notice "that the market was aware of the information contained in news articles submitted by the defendants."). These publications meet the standards for admissibility set forth in Federal Rule of Evidence 201(b). Accordingly, we take judicial notice of them solely as an indication of what information was in the public realm at the time.

## IV. Constitutionality of § 354.4 Under the Foreign Affairs Doctrine

The Supreme Court has characterized the power to deal with foreign affairs as a primarily, if not exclusively, federal power. *See, e.g.*, *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413-14 (2003); *Zschernig v. Miller*, 389 U.S. 429, 432 (1968); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). The Supreme Court has declared state laws unconstitutional under the foreign affairs doctrine when the state law conflicts with a federal action such as a treaty, federal statute, or express executive branch policy. *See, e.g.*, *Garamendi*, 539 U.S. at 421-22 (invalidating a California statute which conflicted with Presidential foreign policy); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000) (invalidating a Massachusetts statute which stood as an obstacle to a Congressional act imposing sanctions on Burma); *U.S. v. Belmont*, 301 U.S. 324, 327 (1937) (holding that the Litvinov Assignment, an executive agreement, preempted New York public policy).

Occasionally, however, in the absence of any conflict, the Court has declared state laws to be incompatible with the federal government's foreign affairs power. *See, e.g.*, *Zschernig*, 389 U.S. at 432 (striking down an Oregon probate law, in the absence of any federal action, because it was an "intrusion by

the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress"); *Hines*, 312 U.S. at 63 (invalidating a Pennsylvania immigration law because the field of immigration regulation was occupied exclusively by federal statutes and regulations); *see also Deutsch*, 324 F.3d at 712 (concluding that § 354.6 infringed on the federal government's exclusive power to wage and resolve war).

The Museum argues that § 354.3 is preempted under either theory. First, the Museum contends, § 354.3 conflicts with the Executive Branch's policy of external restitution following World War II. Alternatively, the Museum argues, § 354.3 is preempted because it infringes on the federal government's exclusive power to conduct foreign affairs, and specifically, the power to redress injuries arising from war. We address each argument in turn.

### A. Does § 354.3 Conflict With the Executive Branch's Policy of External Restitution?

[1] Federal law's "power" to preempt state law arises from the Supremacy Clause, which provides that "the Laws of the United States" and "all Treaties . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Under a traditional statutory preemption analysis, conflict or obstacle preemption occurs where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citing *Hines*, 312 U.S. at 67) (internal quotation marks omitted).

[2] Executive agreements settling claims with foreign nations and nationals have long been accorded the same preemptive effect. *Garamendi*, 539 U.S. at 416 ("[V]alid executive agreements are fit to preempt state law, just as treaties are[.]"); *Dames & Moore v. Regan*, 453 U.S. 654 (1981);

*United States v. Pink*, 315 U.S. 203 (1941); *Belmont*, 301 U.S. at 324. In *Garamendi*, the Supreme Court invalidated a California statutory scheme which facilitated litigation of Holocaust-era insurance claims. *Garamendi*, 539 U.S. at 401. The Court concluded that the California scheme posed an obstacle to the German Foundation Agreement and other expressions of Executive Branch policy preferring non-judicial resolution of such claims. *Id.* at 405-07.

Here, the Museum contends that § 354.3 is preempted by the Executive Branch's policy of external restitution. This policy, the Museum argues, was expressed in two main sources: first, the London Declaration, and second, "Art Objects in US Zone," a U.S. policy statement approved by President Truman during the Potsdam Conference in August of 1945.

### London Declaration

The United States and the Netherlands, along with sixteen other nations, were signatories to the London Declaration of January 5, 1943. Forced Transfers of Property in Enemy-Controlled Territory, 1943, in 3 Dep't of State, Treaties and Other International Agreements of the United States of America 1776-1949, p. 754 (C. Bevans comp. 1969) (hereinafter Bevans). The Declaration served as a "formal warning to all concerned, and in particular persons in neutral countries," that the Allies intended "to do their utmost to defeat the methods of dispossession practiced by the governments with which they [were] at war[.]" *Id.*

In the Declaration, the Allies explicitly reserved the right to invalidate wartime transfers of property, regardless of "whether such transfers or dealings [had] taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport[ed] to be voluntarily effected." *Id.* The Declaration does not explicitly address restitution or reparations, but has been credited by some with laying the

foundation for the United States's postwar restitution policy. *See, e.g.*, Plunder and Restitution at SR-139.

### Art Objects in U.S. Zones

When the American forces entered Germany in the winter of 1944-45, they discovered large stashes of Nazi-looted art, hidden in castles, banks, salt mines, and even caves. Plunder and Restitution at SR-13, SR-85. U.S. authorities established several central collection points within the U.S. Zone to assemble the recovered artwork "for proper care and study." Report, Art Objects in US Zone, July 29, 1945, NACP, RG 338, USGCC HQ, ROUS Army Command, Box 37, File: Fine Art [313574-575] (hereinafter "Art Objects in U.S. Zone").

On July 29, 1945, at the Potsdam Conference, President Truman approved a policy statement setting forth the standard operating procedures governing the looted artwork found within the U.S. zone of occupation. Art Objects in US Zone; Roberts Commission Report at 148. The governments of the formerly occupied countries submitted consolidated lists of items taken by the Germans, with information about the location and circumstances of the theft. Plunder and Restitution at SR-142. The U.S. authorities examined the lists, and when artwork was identified, it was returned to the country of origin. *Id.* Under this policy of "external restitution," the U.S. restituted the looted artwork to countries, not individuals. Art Objects in US Zone; Plunder and Restitution at SR-139-SR-142. The newly liberated governments were responsible for restituting the art to the individual owners. Once the art was returned to the country of origin, the U.S. played no further role.

A contemporaneous memorandum from the State Department illuminates several of the reasons the federal government preferred the policy of external restitution over individual restitution. U.S. Dep't of State, Memorandum from Interdivisional Comm. on Rep., Rest., & Prop. Rights, Sub-

comm. 6, Recommendations on Restitution, Apr. 10, 1944, 1, NACP, RG 59, Lot 62D-4, Box 49, State/Notter, [320633-644] (hereinafter Recommendations on Restitution). First, in view of the complexities of the sham transactions through which the Nazis seized many of the artworks, the State Department felt it best to allow the individual countries to handle restitution in "whatever way they see fit." *Id.* at 2. Second, the State Department observed, in some cases, it might "be impossible to locate the original owners or their heirs and the governments involved will have to decide what should be done with the property or proceeds therefrom." *Id.* Finally, the State Department recognized that the liberated countries themselves had a stake in the restitution of art owned by their citizens:

> [I]n many, if not most, cases the local funds [with which the Nazis "purchased" the art from the persecuted] were supplied originally by the local government or central bank as occupation costs or through forced credits. The Germans in effect forced the local government to pay for their purchases. The individual owner received recompense in local currency but the country as a whole received no recompense for the transfer of property to foreign owners. These cases constitute looting just as much as the cases of outright seizure without recompense.

*Id.* at 2-3.

The U.S. authorities stopped accepting claims for external restitution of looted artwork as of September 15, 1948. Plunder and Restitution at SR-143. By the beginning of 1949, close to three million pieces of Jewish cultural property had been restituted to twelve different countries by the U.S. authorities. *Id.*

Had California enacted § 354.3 in 1945, it would have directly conflicted with the federal government's policy of

external restitution. If the statute had been enacted in the immediate aftermath of the war, it would have presented a competing method of resolving restitution claims, and a forum for individuals to seek the return of their looted art—in clear contravention of the Executive Branch policy. The California statute also would have presented a direct threat to several of the goals underlying the Executive Branch's policy, including the rehabilitation of Germany.

[3] The United States's policy of external restitution, however, ended in 1948. After September 15, 1948, the U.S. authorities refused to accept any more claims for external restitution. Plunder and Restitution at SR-143. In fact, as Saher states in her complaint, the Cranachs were returned to the Netherlands through the U.S. external restitution program. Section 354.3 cannot conflict with or stand as an obstacle to a policy that is no longer in effect.

The Museum also argues, however, that many of the federal government's concerns leading to the external restitution policy remain relevant today. For example, the Museum argues that claims under § 354.3 are problematic, because they ask California courts to review the restitution decisions of foreign governments.[3] Even if true, there would still be no conflict because, as stated above, the external restitution policy is no longer in effect.

[4] In sum, had the California statute been enacted immediately following WWII, it undoubtedly would have conflicted with the Executive Branch's policy of external resolution. The statute does not, however, conflict with any current foreign policy espoused by the Executive Branch.

---

[3]These and other related concerns are addressed more fully in the section below dealing with field preemption.

*B.   In the Absence of Any Conflict With Federal Law or Foreign Policy, is § 354.3 Nonetheless Preempted Under the Foreign Affairs Doctrine?*

At times, albeit seldomly, the Supreme Court has found a state law to be preempted because it infringes upon the federal government's exclusive power to conduct foreign affairs, even though the law does not conflict with a federal law or policy. *Zschernig*, 389 U.S. at 432; *Hines*, 312 U.S. at 63. In *Garamendi*, the Court suggested that a traditional statutory "field" preemption analysis should be employed in such cases:

> If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted, and if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. See, e.g., *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941).

*Garamendi*, 539 U.S. at 420 n.11.

**[5]** Unlike its traditional statutory counterpart, foreign affairs field preemption may occur "even in [the] absence of a treaty or federal statute, [because] a state may violate the Constitution by establishing its own foreign policy." *Deutsch*, 424 F.3d at 709 (internal citation and quotations omitted). The central question, then, is this: in enacting § 354.3, has California addressed a traditional state responsibility, or has it infringed on a foreign affairs power reserved by the Constitution exclusively to the national government?

### 1. Does § 354.3 Concern a Traditional State Responsibility?

Saher contends § 354.3 concerns a quintessential state function: the establishment of a statute of limitations for actions seeking the return of stolen property. Property, of course, is traditionally regulated by the state. But § 354.3 cannot be fairly categorized as a garden variety property regulation. Section 354.3 does not apply to all claims of stolen art, or even all claims of art looted in war. The statute addresses only the claims of Holocaust victims and their heirs. Section 354.3(b).

[6] Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs. *See, e.g.*, *Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws); *Crosby*, 530 U.S. at 367, 373 n.7 (rejecting purported state interest in taxing and spending); *Zschernig v. Miller*, 389 U.S. 429, 437-38 (1968) (rejecting purported state interest in regulating descent of property); *Deutsch*, 324 F.3d at 707 (rejecting purported state interest in procedural rules).

The *Garamendi* Court in dicta rejected the "traditional state interests" advanced by California in support of HVIRA, finding instead that the real purpose of the state law was the "concern for the several thousand Holocaust survivors said to be living in the state." *Garamendi*, 539 U.S. at 426. Though § 354.3 purports to regulate property, an area traditionally left to the states, like HVIRA, § 354.3's real purpose is to provide relief to Holocaust victims and their heirs.

California's desire to help its resident Holocaust victims and their heirs is a noble legislative goal, with which we are entirely sympathetic. In *Garamendi*, however, the Supreme Court held that "California's concern for the several thousand Holocaust survivors said to be living in the state . . . does not

displace general standards for evaluating a State's claim to apply its forum law to a particular controversy or transaction, under which the State's claim is not a strong one." *Garamendi*, 539 U.S. at 426-27. The State's interest alone was not sufficient in *Garamendi* to save the statute: "[T]here being about 100,000 survivors in the country, only a small fraction of them live in California. As against the responsibility of the United States of America, the humanity underlying the state statute could not give the State the benefit of any doubt in resolving the conflict with national policy." *Id*.

California arguably has a stronger interest in enacting § 354.3 than it did in enacting the related statutes struck down in *Deutsch* and *Garamendi*. Section 354.3 addresses the problem of Nazi-looted art currently hanging on the walls of the state's museums and galleries. Assem. Jud. Com., Background Information Worksheet for Assem. Bill No. 1758 (2001-2002 Reg. Sess.) Jan. 30, 2002.

California certainly has a legitimate interest in regulating the museums and galleries operating within its borders, and preventing them from trading in and displaying Nazi-looted art. Indeed, it appears the original goal of § 354.3 may have been to regulate California museums and galleries in such a manner. Prior to its enactment, however, the bill was amended. The restriction limiting the scope of the statute to suits against "museums and galleries in California" was stricken. Assem. Amend. to Assem. Bill No. 1758 (2001-2002 Reg. Sess.); Sen. Jud. Com., Analysis of Assem. Bill No. 1758 (2001-2002 Reg. Sess.) Jun. 25, 2002, pp. 5-6. As enacted, the statute allows suits against "any museum or gallery that displays, exhibits, or sells any article of historical, interpretive, scientific, or artistic significance," whether located in the state or not. Section 354.3(a)(1).

The scope of the statute as enacted belies California's purported interest in protecting its residents and regulating its art trade. The amended version of § 354.3 suggests that Califor-

nia's real purpose was to create a friendly forum for litigating Holocaust restitution claims, open to anyone in the world to sue a museum or gallery located within or without the state. A memorandum from the Governor's office provides further illustration of California's intent. In it, California is characterized as a pioneering leader in the quest for justice for Holocaust victims:

> In the past decade, it has come to the public's attention that spoils gained by the Nazi Holocaust were enjoyed not just by the Nazis. *California has been a leader in exposing those entities* who benefitted financially from the plunder or exploited the unusual circumstances of the Holocaust, who have been less than forthcoming in their business dealings.

Governor's Office of Planning & Research, Enrolled Bill Report on Assem. Bill No. 1758 (2001-2002) Reg. Sess.) Aug. 1, 2002 (emphasis added).

By opening its doors as a forum to all Holocaust victims and their heirs to bring Holocaust claims in California against "any museum or gallery" whether located in the state or not, California has expressed its dissatisfaction with the federal government's resolution (or lack thereof) of restitution claims arising out of Word War II. In so doing, California can make "no serious claim to be addressing a traditional state responsibility." *Garamendi*, 539 U.S. at 419 n.11; *see also Deutsch*, 324 F.3d at 712 (rejecting California's interest in "redress-[ing] wrongs committed in the course of the Second World War"). California cannot have a "distinct juristic personality" from that of the United States when it comes to matters of foreign affairs. *Pink*, 315 U.S. at 232. When it comes to dealings with foreign nations, "state lines disappear." *Belmont*, 301 U.S. at 331.

[7] In sum, the scope of § 354.3 belies any purported state interest in regulating stolen property or museums or galleries

within the State. By enacting § 354.3, California has created a world-wide forum for the resolution of Holocaust restitution claims. While this may be a laudable goal, it is not an area of "traditional state responsibility," and the statute is therefore subject to a field preemption analysis. *See Garamendi*, 539 U.S. at 419 n.11.

**2. Does the California Statute Intrude on a Power Expressly or Impliedly Reserved to the Federal Government by the Constitution?**

The District Court held that § 354.3 intrudes on the power to make and resolve war, a power reserved exclusively to the federal government by the Constitution. We agree.

The Constitution divides the war power between the Executive, who is the Commander-in-Chief of the Armed Forces, and the Congress, who has the power to declare war. U.S. Const. art. II, § 2; *Id.* at art. I, § 8. *Deutsch* clearly provides that "[m]atters related to war are for the federal government alone to address," and state statutes which infringe on this power will be preempted. *Deutsch*, 324 F.3d at 712.

Section 354.3 establishes a remedy for wartime injuries. The legislative findings accompanying the statute repeatedly reference the "Nazi regime," "Nazi persecution," and "the many atrocities" the Nazis committed. 2002 Cal. Legis. Serv. 332 (West 2002). By enacting § 354.3, California "seeks to redress wrongs committed in the course of the Second World War" — a motive that was fatal to § 354.6. *Deutsch*, 354 F.3d at 712.

Section 354.3 was closely modeled on § 354.6, which was found to infringe on the federal government's exclusive power to make and resolve war. Sen. Rules Com., Off. of Sen. Floor Analyses, 3d. reading analysis of Assem. Bill No. 1758 (2001-2002 Reg. Sess.) Aug. 8, 2002. Like its sister statute struck down in *Deutsch*, § 354.3 "creates a special rule that

applies only to a newly defined class" of plaintiffs. *Id.* Like § 354.6, § 354.3 creates a new cause of action "with the aim of rectifying wartime wrongs committed by our enemies or by parties operating under our enemies' protection." 324 F.3d at 708. This is significant because, as the *Deutsch* Court noted, "[a] state is generally more likely to exceed the limits of its power when it seeks to alter or create rights and obligations than when it seeks merely to further enforcement of already existing rights and duties." 324 F.3d at 708.

Saher, however, argues that § 354.3 is distinguishable from the statute at issue in *Deutsch*, because it does not target former wartime enemies. Section 354.3 authorizes suits only against museums and galleries, but the actionable injury at the heart of the statute is the Nazi theft of art. The California legislature enacted § 354.6 "with the aim of rectifying wartime wrongs committed by our enemies or by parties operating under our enemies' protection." *Deutsch*, 324 F.3d at 708. California enacted § 354.3 with the same verboten intent. Distinctions between the class of eligible defendants are irrelevant in light of this fatal similarity.

Saher also contends that under *Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005), claims for restitution of "garden variety property" can be distinguished from claims for reparation arising from wartime injury. In *Alperin* we considered whether the claims for restitution presented by a class of Holocaust survivors presented a nonjusticiable political question. Saher places particular reliance on the following quote: "Reparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution." *Alperin*, 410 F.3d at 551. This quote references the first *Baker* test, which requires courts to consider whether the case in question concerns an issue that has been textually committed by the Constitution to another branch of government. *Id.* at 544, 549-52 (citing *Baker v. Carr*, 369 U.S. 186, 210-11 (1962)). Ultimately, in *Alperin* we concluded that despite the political overtones inherent in cases brought by Holocaust survivors,

the underlying property issues presented in such cases were not political questions constitutionally committed to the political branches. *Id*. at 551.

Saher's reliance on *Alperin* is misplaced. Our holding that the judiciary has the power to adjudicate Holocaust-era property claims does not mean that states have the power to provide legislative remedies for these claims. Here, the relevant question is whether the power to wage and resolve war, including the power to legislate restitution and reparation claims, is one that has been exclusively reserved to the national government by the Constitution. We conclude that it has.

**[8]** Section 354.3, at its core, concerns restitution for injuries inflicted by the Nazi regime during Word War II. Claims brought under this statute, including the instant claim, would require California courts to review acts of restitution made by foreign governments. For example, in this case, the parties contest the provenance of the Cranachs. In order to determine whether the Museum has good title to the Cranachs, a California court would necessarily have to review the restitution decisions made by the Dutch government and courts. This example illustrates that § 354.3 claims cannot be separated from the Nazi transgressions from which they arise.

Our conclusion today is buttressed by the documented history of federal action addressing the subject of Nazi-looted art. The Art Looting and Investigation Unit of the Office of Strategic Services gathered a great deal of intelligence about looted art through covert operations during and after the war. Plunder and Restitution at SR-92. Immediately following the war, the federal government implemented the program of external restitution, as discussed in more detail above. It is beyond dispute that there was no role for individual states to play in the restitution of Nazi-looted assets during and immediately following the war.

Recent Administrations and Congresses continue to address problems facing Holocaust survivors and their heirs. *See, e.g.*, Pub. L. No. 105-186, June 23, 1998, 112 Stat. 611, codified at 22 U.S.C. § 1621 (establishing the Presidential Advisory Commission on Holocaust Assets in the United States); Plunder & Restitution, supra (the final report of the Presidential Advisory Commission on Holocaust Assets in the United States); U.S. Dep't of State, Washington Conference Principles on Nazi-Confiscated Art (Dec. 3, 1998), http://www.state.gov/p/eur/rt/hlcst/23231.htm (hereinafter Washington Principles). (adopted by the forty-four governments participating in the Washington Conference on Holocaust-Era Assets, hosted by the State Department on December 3, 1998). This history of federal action is so comprehensive and pervasive as to leave no room for state legislation. *Cf. English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) (discussing traditional statutory field preemption).

**[9]** Finally, the federal government, "representing as it does the collective interests of the . . . states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." *Hines*, 312 U.S. at 63. The recovery of Holocaust-era art affects the international art market, as well as foreign affairs. Many have called for the creation of an international registration system, and a commission to settle Nazi-looted art disputes. *See, e.g.*, Pollock, 43 Houston L. Rev. at 231. Only the federal government possesses the power to negotiate and establish these or other remedies with the international community. As discussed above, the federal government has initiated discussions with other countries, which will hopefully yield a comprehensive remedy for all Holocaust victims and their heirs. *See, e.g.*, Washington Conference Report. No organization comparable to the International Commission on Holocaust Era Insurance Claims has been established yet to resolve Holocaust-era art claims. This does not, however, justify California's intrusion into a field occupied exclusively by the federal government.

**[10]** In sum, it is California's *lack* of power to act which is ultimately fatal. In *Deutsch*, we held that "[i]n the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Deutsch*, 324 F.3d at 714. California may not improve upon or add to the resolution of the war. *Id.* The factual circumstances surrounding this case — the many years which have passed since Göring stole the Cranachs from Goudstikker, restitution of the paintings to the Netherlands by the Allies, or the changes in ownership since then — cannot save § 354.3 from this fatal flaw.

## V. Did the District Court Err in Concluding that Saher's claim was Time-Barred Under California Code of Civil Procedure § 338?

**[11]** Though Saher cannot bring her claim under § 354.3, she may be able to state a cause of action within the three-year statute of limitations of § 338. The district court held that Saher's § 338 claim was time-barred, because she did not inherit her interest in the Cranachs until after the statute of limitations on the claim had expired. The claim, however, might survive a Rule 12(b)(6) motion to dismiss depending upon how Saher might be able to allege the notice element.

### A. *Constructive Notice*

At the time the museum acquired the Cranachs, around 1971, § 338 provided a strict three-year statute of limitations. Cal. Civ. Proc. Code § 338(3).[4] In 1982, the section was amended to incorporate a discovery rule: "[T]he cause of action in the case of theft, as defined in § 484 of the Penal

---

[4]In 1988, § 383(3) was renumbered § 383(c); all subsequent references refer to subsection (c) for simplicity's sake. 1988 Cal. Legis. Serv. 1186 (West).

Code, of any art or artifact is not deemed to have accrued until the discovery of the whereabouts of the article by the aggrieved party, his or her agent, or the law enforcement agency that originally investigated the theft."[5] Cal. Civ. Proc. Code § 338(c); 1982 Cal. Legis. Serv. 3401 (West). Saher does not claim that the 1982 amendments should be applied to her case. Rather, she contends that the statute of limitations on her claim did not begin to run until she discovered that the Cranachs were in the possession of the museum.

Decisions from California's intermediate appellate court have reached differing conclusions as to when the statute of limitations under § 338 begins to run for property stolen prior to 1983. In *Naftzger v. American Numismatic Society*, the court held that a cause of action for the return of property stolen before the 1982 amendment "accrue[s] when the owner discovered the identity of the person in possession of the stolen property, and not when the theft occurred." 49 Cal. Rptr. 2d 784, 786 (Cal. Ct. App. 1996). The *Naftzger* court concluded that "there was a discovery rule of accrual implicit in the prior version of section 338." 49 Cal. Rptr. 2d at 786. In *Society of California Pioneers v. Baker*, however, the court held that prior to the 1982 amendments, "the statute of limitations began to run anew against a subsequent purchaser." 50 Cal. Rptr. 2d 865, 869-70 (Cal. Ct. App. 1996). The *Pioneers* court specifically noted its disagreement with *Naftzger*. 50 Cal. Rptr. 2d at 870 n.10.

The California Supreme Court has not addressed the issue, but "has, however, specifically held that the discovery rule, whenever it applies, incorporates the principle of constructive notice." *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007) (citing *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d. 1103, 1109 (1988)). Thus, in *Orkin*, we concluded that "under the discov-

---

[5]In 1989, the phrase "art or artifact" was replaced with "article of historical, interpretive, scientific, or artistic significance." Cal. Civ. Proc. Code § 338(c) (West 1989).

ery rule, a [pre-1983] cause of action accrues when the plaintiff discovered *or reasonably could have discovered* her claim to and the whereabouts of her property." *Id.* at 471.

Saher argues, however, that the *Naftzger* court adopted a discovery rule based on actual, not constructive, notice. As we pointed out in *Orkin*, such a rule would be clearly inconsistent with California Supreme Court precedent. *Id.* (citing *Jolly*, 44 Cal. 3d at 1109).

Saher urges that we certify the issue to the Supreme Court of California for resolution. Though Saher contends that the Orkin court's interpretation of California state law is incorrect, "it is well established that we may reconsider earlier Ninth Circuit precedent only by en banc review or after an intervening Supreme Court decision." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1285 (9th Cir. 1992) (declining to revisit the court's interpretation of New York state law under similar circumstances). Under *Orkin*, we are bound to apply a constructive notice standard.

**[12]** In conclusion, Saher's cause of action began to accrue when she discovered or reasonably could have discovered her claim to the Cranachs, and their whereabouts. *Orkin*, 487 F.3d at 741.

### *B. Reasonable Diligence*

The Museum asserts that Saher is precluded as a matter of law from making the required showing of reasonable diligence, because the facts underlying her claim were publicly available. We disagree.

A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when "the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). "[A] complaint cannot be dismissed

unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1206 (9th Cir. 1995).

In *Orkin*, we concluded that the plaintiffs' claims were time-barred because the face of the complaint established facts that foreclosed any showing of reasonable diligence. *Orkin*, 487 F.3d at 742. The Orkins' complaint admitted that the defendant had purchased the painting in question at a publicized auction, and that she was listed as the owner in a publicly available catalogue raisonné. *Id.* at 741-42. By contrast, there are no facts on the face of Saher's complaint which foreclose a showing of lack of reasonable notice as a matter of law.

**[13]** Because it is not clear that Saher's complaint could not be amended to show a lack of reasonable notice, dismissal without leave to amend was not appropriate. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). We, therefore, grant Saher leave to amend her complaint to allege the lack of reasonable notice to establish diligence under California Code of Civil Procedure § 338, and remand this case to the district court for that purpose.

## VI. Conclusion

The judgment of the district court is **AFFIRMED** in part and **REVERSED** in part. The case is **REMANDED** for further proceedings consistent with this opinion.

PREGERSON, Circuit Judge, dissenting in part:

I dissent from the majority's conclusion that California is acting outside the realm of traditional state responsibility, and that field preemption applies. Where a State acts within its

"traditional competence," the Supreme Court has suggested that conflict preemption, not field preemption, is the appropriate doctrine. *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 395, 420 n.11 (2003). *Garamendi* counsels that field preemption would apply "[i]f a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility. . . ." *Id*. That is not the case here.

It is undisputed that property is traditionally regulated by the State. The majority acknowledges that California has a legitimate interest in regulating museums and galleries, and that California Code of Civil Procedure § 354.3 "addresses the problem of Nazi-looted art currently hanging on the walls of the state's museums and galleries." Maj. Op. at 1032. However, the majority goes on to hold that because Section 354.3 applies to any museum or gallery, "California has created a world-wide forum for the resolution of Holocaust restitution claims," and that the State is therefore acting outside the scope of its traditional interests. Maj. Op. at 1034.

The majority reads the statute far too broadly. A reasonable reading of "any museum or gallery" would limit Section 354.3 to entities subject to the jurisdiction of the State of California. Because California has a "serious claim to be addressing a traditional state responsibility," it is clear that *Garamendi* requires us to apply conflict preemption, not field preemption.

The majority's reliance on *Deutsch v. Turner*, 324 F.3d 692, (9th Cir. 2005) is misplaced. The statute in *Deutsch*, California Code of Civil Procedure § 354.6, allowed recovery for slave labor performed "between 1929 and 1945, [for] the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers." This court held that California impermissibly intruded upon the power of the federal government to resolve war by enacting the *Deutsch* statute "with the aim of rectifying wartime wrongs

*committed by our enemies . . . .*" *Id.* at 708, 711(emphasis added).

The majority concludes that Section 354.3 suffers from a "fatal similarity" to the *Deutsch* statute because Section 354.3 applies to looted artwork. Maj. Op. at 1035. I do not agree. The majority overlooks significant differences between the *Deutsch* statute and Section 354.3. First, as discussed above, here California has acted within the scope of its traditional competence to regulate property over which it has jurisdiction. Furthermore, unlike the statute in *Deutsch,* Section 354.3 does not target enemies of the United States for wartime actions. Nor, contrary to the majority's characterization, does Section 354.3 provide for war reparations.[1] Maj. Op. at 1036. Here, Appellee, a museum located in California, acquired stolen property in 1971. Appellant now seeks to recover that property. I fail to see how a California statute allowing such recovery intrudes on the federal government's power to make and resolve war.

I would reverse the district court. As the majority correctly holds, Section 354.3 does not conflict with federal policy. However, California has acted within its traditional competence, and field preemption should not apply. Accordingly, I dissent in part.

---

[1]Black's Law Dictionary defines reparation as "[c]ompensation for an injury or wrong, esp. for wartime damages or breach of an international obligation." *Black's Law Dictionary* 1325 (8th ed. 2004). Section 354.3 allows only for the recovery of stolen art.