**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLAUDE CASSIRER,
                    *Plaintiff-Appellee,*

                    v.

KINGDOM OF SPAIN, a foreign state,
                    *Defendant,*

                    and

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,

                    *Defendant-Appellant.*

No. 06-56325

D.C. No.
05-CV-03459-GAF

CLAUDE CASSIRER,
                    *Plaintiff-Appellee,*

                    v.

KINGDOM OF SPAIN, a foreign state,
                    *Defendant-Appellant,*

                    and

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,

                    *Defendant.*

No. 06-56406

D.C. No.
CV-05-03459-GAF

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

11457

Argued and Submitted
March 24, 2010—San Francisco, California

Filed August 12, 2010

Before: Alex Kozinski, Chief Judge, Pamela Ann Rymer,
Andrew J. Kleinfeld, Sidney R. Thomas, Barry G. Silverman,
William A. Fletcher, Ronald M. Gould, Richard A. Paez,
Consuelo M. Callahan, Carlos T. Bea and N. Randy Smith,
Circuit Judges.

Opinion by Judge Rymer;
Dissent by Judge Gould

**COUNSEL**

Thaddeus J. Stauber, (argued), Walter T. Johnson, Nixon Peabody LLP, Los Angeles, California, for defendants-appellants Thyssen-Bornemisza Collection Foundation. William M. Barron, Alston & Bird LLP, New York, New York; Anthony A. De Corso, Beck, De Corso, Daly, Kreindler & Harris, Los Angeles, California, for defendant-appellant Kingdom of Spain.

Stuart R. Dunwoody, Davis Wright Tremaine LLP, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

RYMER, Circuit Judge:

Claude Cassirer is an American citizen whose grandmother's Pissarro painting was allegedly confiscated in 1939 by an agent of the Nazi government in Germany because she was a Jew. He filed suit in federal district court to recover the painting, or damages, from the Kingdom of Spain and the Thyssen-Bornemisza Collection Foundation, an instrumentality of Spain, which now claims to own the painting. Spain and the Foundation moved to dismiss, asserting, among other things, sovereign immunity pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, *et seq*. The FSIA makes a foreign state immune from suit in the courts of the United States unless an exception applies. The district court denied the motions, *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157 (C.D. Cal. 2006), and also denied motions to dismiss for lack of a case or controversy, personal jurisdiction, and proper

venue. Spain and the Foundation appealed, raising most of these issues.

Cassirer relies on the "international takings" or "expropriation" exception in the FSIA that confers subject matter jurisdiction over a foreign state when "rights in property taken in violation of international law" are at issue; the property is owned "by an agency or instrumentality of the foreign state"; and the instrumentality "is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). Spain and the Foundation maintain that this exception is not applicable because the painting was taken in violation of international law by Germany, not by either of them, and because the Foundation is not engaged in commercial activity in the United States sufficient to trigger the exception. Spain contends that Cassirer should have exhausted remedies in Germany or Spain, but failed to do so. Spain also contests the existence of a case or controversy, while the Foundation challenges the exercise of personal jurisdiction.

Our review is constrained because this is an appeal before final judgment has been entered. Generally, we may review only final decisions of a district court, but our jurisdiction also extends to a small category of collateral orders that are separate from the merits and can't effectively be reviewed on appeal from a final judgment. A ruling that denies sovereign immunity is such an order. Consequently, we may hear the appeal taken from the district court's order denying the motions to dismiss for lack of subject matter jurisdiction based on sovereign immunity. But its decision declining to dismiss the action for lack of personal jurisdiction and a case or controversy is fully reviewable on appeal after judgment. For this reason we have no appellate jurisdiction over these issues, and will dismiss the appeal as to them.

On the issue of sovereign immunity, we conclude that § 1605(a)(3) does not require the foreign state against whom the claim is made to be the one that took the property. We are

satisfied that the record supports the district court's finding of a sufficient commercial activity in the United States by the Foundation. The statute does not mandate that the plaintiff exhaust local remedies for jurisdiction to lie, and we do not consider a prudential exhaustion analysis given our limited appellate jurisdiction. This being so, we will affirm the order that the expropriation exception applies such that the court has subject matter jurisdiction over the action as to both Spain and the Foundation.

I

The property at issue is an oil painting by the French impressionist master Camille Pissarro, *Rue Saint-Honoré, après-midi, effet de pluie*.[1] It was completed in 1897 and sold in 1898 to Cassirer's great-grandfather, Julius Cassirer, who lived in Germany. The painting remained in the family for some forty years, eventually passing to Lilly Cassirer, Cassirer's grandmother, upon her husband's death. She later remarried.

In 1939 Lilly decided she had no choice but to leave Germany. By that time — as the district court judicially noticed — German Jews had been deprived of their civil rights, including their German citizenship;[2] their property was being "Aryanized"; and the Kristallnacht pogroms had taken place throughout the country. Permission was required both to leave and to take belongings. The Nazi government appointed

---

[1]Except as noted, we take the facts as alleged in the complaint as true because we are reviewing a denial of a motion to dismiss. *Altmann v. Republic of Austria*, 317 F.3d 954, 961-62 (9th Cir. 2002), *amended by* 327 F.3d 1246 (9th Cir. 2003), *aff'd by* 541 U.S. 677 (2004).

[2]Citizenship matters because we have held that the takings exception, at issue here, does not apply where the plaintiff is a citizen of the country that expropriates his property. *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990). The district court's determination that Lilly was no longer regarded by Germany as a German citizen is not challenged on appeal.

Munich art dealer Jakob Scheidwimmer as the official appraiser to evaluate the works of art, including the Pissarro painting, that Lilly wished to take with her. Scheidwimmer refused to allow her to take the painting out of Germany and demanded that she hand it over to him for approximately $360. Fearing she would not otherwise be allowed to go, and knowing she would not actually get the money because the funds would be paid into a blocked account, Lilly complied.

Scheidwimmer traded the painting to another art dealer, who was also persecuted and fled Germany for Holland. After Germany invaded Holland, the Gestapo confiscated the painting and returned it to Germany, where it was sold at auction to an anonymous purchaser in 1943. It turned up at a New York gallery in 1952 and was sold to a St. Louis collector; it was sold again in 1976 to a New York art dealer who, in turn, sold it to Baron Hans-Heinrich Thyssen-Bornemisza. Bornemisza lived in Switzerland and was a preeminent private collector.

In 1988, Spain paid the Baron $50 million to lease his collection for ten years. Five years into the lease, Spain paid the Foundation $327 million to purchase the entire collection, including the Pissarro painting. As part of the agreement, Spain provided the Villahermosa Palace in Madrid to the Foundation, free of charge, for use as the Thyssen-Bornemisza Museum.

Claude Cassirer, Lilly's heir, discovered in 2000 that the painting was on display at the Thyssen-Bornemisza Museum in Madrid. He asked Spain's Minister for Education, Culture and Sports, who was chair of the Foundation's board, to return it. The request was refused. In 2003, five members of Congress wrote the Minister requesting return of the painting; this request, too, was rejected. Cassirer did not try to obtain the painting through judicial proceedings in Spain, or to pursue other remedies in Spain or Germany, before bringing suit in the United States.

He filed this action against the Foundation and Spain in the Central District of California on May 10, 2005. The complaint avers that Germany confiscated the painting based on Lilly's status as a Jew and as part of its genocide against Jews; hence the taking was in violation of international law. It alleges that the Foundation is engaged in numerous commercial activities in the United States that include borrowing art works from American museums; encouraging United States residents to visit the museum and accepting entrance fees from them; selling various items to United States citizens including images of the painting; and maintaining a web site where United States citizens may buy admission tickets using United States credit cards and view the paintings on display, including *Rue Saint-Honoré, après-midi, effect de pluie*. The complaint seeks imposition of a constructive trust and return of the painting or, alternatively, recovery of damages for conversion.

The Foundation filed a motion to dismiss based on lack of subject matter and personal jurisdiction, and improper venue. Spain followed with its own motion to dismiss. The district court allowed Cassirer to conduct jurisdictional discovery into the Foundation's commercial activity in the United States. Both motions were then denied. The court certified the matter for interlocutory appeal under 28 U.S.C. § 1292(b), though Spain and the Foundation abjured this route in favor of appeal on the basis of the collateral order doctrine.

In this court, Cassirer filed a motion to dismiss as to issues other than those pertaining to sovereign immunity on the ground that appellate jurisdiction is lacking.[3] The original panel agreed that the district court's denial of motions to dismiss for lack of personal jurisdiction and case or controversy is not immediately appealable as a collateral order. *Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1054-55 (9th Cir. 2009). The panel held that § 1605(a)(3) does not require Spain to be

---

[3]Cassirer also moved to expedite the Foundation's appeal. We granted this motion and *sua sponte* ordered the appeals to be consolidated.

the entity that expropriated the painting in violation of international law, and that the Foundation, which owns the painting, engaged in sufficient commercial activity in the United States to satisfy the FSIA. It further held that exhaustion is not statutorily required; however, a majority concluded that the district court erred in failing to conduct a prudential exhaustion analysis, and remanded for it to do so. We decided to rehear the case en banc. *Cassirer v. Kingdom of Spain*, 590 F.3d 981 (9th Cir. 2009).[4]

## II

We must consider the bounds of our appellate jurisdiction at the outset. By statute, 28 U.S.C. § 1291, we have jurisdiction to review "final decisions" of the district court. A final decision is one that ends the litigation on the merits, *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 884 (9th Cir. 2003), which no decision that is before us does. Still, we may review "a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.' " *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42 (1995) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id*.

It is well settled that sovereign immunity is within this small category of cases from which an immediate appeal will lie. *See, e.g.*, *Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759,

---

[4]As part of our en banc process we asked the parties to file simultaneous briefs as to whether this matter should be reheard en banc. Spain and the Foundation took the position that rehearing en banc is unnecessary because they intend to file a motion to dismiss the complaint on the ground that the claims are time-barred under *Von Saher v. Norton Simon Museum of Art*, 578 F.3d 1016 (9th Cir. 2009). We express no opinion on the merits of this proposition.

763-65 (9th Cir. 2007); *In re Republic of the Philippines*, 309 F.3d 1143, 1148-49 (9th Cir. 2002). The point of immunity is to protect a foreign state that is entitled to it from being subjected to the jurisdiction of courts in this country, protection which would be meaningless were the foreign state forced to wait until the action is resolved on the merits to vindicate its right not to be in court at all. Thus, we have jurisdiction to review the district court's order denying sovereign immunity.

The same is not true of the court's orders denying motions to dismiss for lack of a case or controversy and personal jurisdiction. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 526-27 (1988), and *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003), both recognize that denial of a motion to dismiss for lack of personal jurisdiction is neither a final decision nor appealable under the collateral order doctrine. The FSIA presents a novel situation, however, in that personal jurisdiction over a foreign state exists under the statute if it is not immune and if proper service has been made. 28 U.S.C. § 1330(b); *Altmann*, 317 F.3d at 969. Because the one follows from the other, the rulings arguably are so related that we should consider extending our collateral order jurisdiction over sovereign immunity to resolve personal jurisdiction as well. *See Swint*, 514 U.S. at 50-51 (discussing but not deciding whether a court of appeals with jurisdiction over one ruling can review related rulings that are not themselves independently reviewable). We see no reason to do so here, for the decision points are different.

**[1]** The Foundation argues that exercising personal jurisdiction offends due process. To resolve this argument, we would need to decide whether a foreign state or an instrumentality of a foreign state is a "person" for purposes of the Due Process Clause, whether the FSIA incorporates the requirements of "minimum contacts," and whether the Foundation has sufficient minimum contacts with the United States to support general or specific jurisdiction. Its stance on sovereign immunity, on the other hand, turns on whether the tak-

ings exception applies only to a foreign state that has itself taken property in violation of international law, and whether the Foundation has engaged in a commercial activity in the United States. In short, a decision that a foreign state is not entitled to sovereign immunity under the FSIA is not "inextricably intertwined" with a decision that the exercise of personal jurisdiction comports with due process. *See id.* at 51. Therefore, we decline to expand our collateral order jurisdiction to append review of the latter to the former.

**[2]** Although we have not previously addressed whether denial of a motion to dismiss for lack of a case or controversy is an immediately appealable collateral order, other circuits have indicated that questions of standing, case or controversy, and ripeness are, like the question of personal jurisdiction, not immediately appealable. *See, e.g.*, *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998) (standing); *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 496-97 n.2 (7th Cir. 1993) (same); *Crymes v. DeKalb County*, 923 F.2d 1482, 1484 (11th Cir. 1991) (ripeness); *Shanks v. City of Dallas*, 752 F.2d 1092, 1098 n.9 (5th Cir. 1985) (case or controversy and standing); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 474-75 (2d Cir. 1974) (ripeness and standing), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). We routinely consider these issues on appeal from a final judgment, *see, e.g.*, *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009), and are not persuaded that the district court's order refusing to dismiss this action for lack of a case or controversy should be immediately appealable. While a favorable ruling would remove Spain from the lawsuit just as immunity would do, so too would prevailing on a myriad of other pretrial motions. Achieving an effectively similar result is no reason to bring denial of such motions within the "small category" of decisions that merit immediate review, otherwise the category would be small no longer.

**[3]** Accordingly, we have no appellate jurisdiction to review the district court's denial of motions to dismiss for lack of personal jurisdiction and a case or controversy.

## III

As both the Supreme Court and we have explained the genesis of the FSIA at length, *see Republic of Austria v. Altmann*, 541 U.S. 677, 688-91 (2004); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486-89 (1983); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 705-06 (9th Cir. 1992), we will not do so again except to say that in 1976, Congress codified the "restrictive principle" of sovereign immunity with "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.' " *Altmann*, 541 U.S. at 691 (quoting *Verlinden*, 461 U.S. at 488). The "restrictive principle," then embraced by most nation states, recognized immunity for public acts, that is to say, acts of a governmental nature typically performed by a foreign state, but not for acts of a private nature even though undertaken by a foreign state. Commercial activity is a good example of conduct that would ordinarily be engaged in by a private entity. If a foreign state is not entitled to immunity, then it is liable on claims for relief just like a private individual. 28 U.S.C. § 1606.

"The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality . . . ." *First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 620 (1983); H.R. Rep. No. 94-1487, at 12 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6610 ("The bill is not intended to affect the substantive law of liability.").[5] Put differently, the FSIA simply limits the jurisdiction of Ameri-

---

[5]The House bill was passed in lieu of the Senate bill, so the House Report is the operative legislative history.

can courts to hear claims against foreign states. It creates no cause of action.

Sovereign immunity is a threshold issue because it goes to the court's subject matter jurisdiction. It is a question of law that we review de novo, although to the extent informed by factual findings made by the district court, those findings are reviewed for clear error.

Under the statutory scheme, a district court has subject matter jurisdiction over claims against a foreign state with respect to which the foreign state is not entitled to immunity. 28 U.S.C. § 1330(a).[6] A foreign state is immune except as specified in the FSIA. 28 U.S.C. § 1604.[7] The FSIA has a number of exceptions,[8] but Cassirer invokes only the "expropriation" exception in § 1605(a)(3). Section 1605(a)(3) provides that a foreign state is not immune in any case

> in which rights in property taken in violation of international law are in issue and that property or

---

[6] Section 1330(a) provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

[7] Section 1604 provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

[8] There are exceptions for waiver, *id*. § 1605(a)(1); commercial activity, *id*. § 1605(a)(2); expropriation, *id*. § 1605(a)(3); succession, *id*. § 1605(a)(4); personal injury in the United States, *id*. § 1605(a)(5); arbitration, *id*. § 1605(a)(6); maritime liens, *id*. § 1605(b); terrorism, *id*. § 1605A; and counterclaims, *id*. § 1607.

> any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

So far as the first condition is concerned, a taking offends international law when it does not serve a public purpose, when it discriminates against those who are not nationals of the country, or when it is not accomplished with payment of just compensation. *See Siderman*, 965 F.2d at 711-12; *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 831-33 (9th Cir. 1987). As we noted in *Siderman*, both the House Report on the FSIA and the Restatement of Foreign Relations Law reflect a similar understanding.[9] "At the jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a 'claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of our jurisdiction.' " *Siderman*, 965 F.3d at 711 (quoting *West*, 807 F.2d at 826). On appeal, neither Spain nor the Foundation contends that Germany's actions with respect to the painting were not a taking in violation of international law.

So far as the commercial activity prong is concerned, just the second clause is pertinent here as there is no dispute the painting is not "present in the United States." Thus, there is

---

[9]The House Report describes the phrase "taken in violation of international law" as including expropriations that are "arbitrary or discriminatory in nature," or done "without payment of the prompt adequate and effective compensation required by international law." 965 F.2d at 712 (quoting H.R. Rep. No. 94-1487, at 19-20). The Restatement provides that a foreign state is responsible for injury from a taking that "(a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation. . . ." Restatement (Third) of Foreign Relations Law of the United States § 712 (1987).

jurisdiction under § 1605(a)(3) if the Foundation, which admittedly owns the painting and concedes it is an instrumentality of Spain for purposes of the statute, "is engaged in a commercial activity in the United States." "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

With this by way of background, we turn to the questions that are dispositive here: whether § 1605(a)(3) covers a claim against Spain and the Foundation when neither was the foreign state that took the painting in violation of international law; whether the Foundation is engaged in a sufficient commercial activity in the United States; and whether exhaustion of remedies is required as a prerequisite to jurisdiction.

### A

The Foundation's lead point, joined by Spain, is that the takings exception applies only to the foreign state that expropriated the property and not to some later purchaser who was not complicit in the taking. More specifically, the Foundation contends that because the language of § 1605(a)(3) does not identify the taker, the text can as easily be read to imply a taking "by *the* foreign state" as a taking "by *any* foreign state."

**[4]** We agree with the district court that the plain language of the statute does not require that the foreign state against whom the claim is made be the entity which took the property in violation of international law. Section 1605(a)(3) simply excepts from immunity "a foreign state" in any case "in which rights in *property taken in violation of international law* are in issue." (emphasis added). The text is written in the passive voice, which "focuses on an event that occurs without respect to a specific actor." *Dean v. United States*, 129 S. Ct. 1849, 1853 (2009) (so observing with respect to the phrase "if the

firearm is discharged"); *see Watson v. United States*, 552 U.S. 74, 80-81 (2007) (noting that use of the phrase "to be used" reflects "agnosticism . . . about who does the using"). Thus, the text already connotes "*any* foreign state." It would have to be rewritten in order to carry the meaning the Foundation ascribes to it. That is, the statute would need to say that a foreign state is not immune in a case "in which rights in property taken *by the foreign state* in violation of international law are in issue."

**[5]** In the normal event our task is over when a statute is clear on its face. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). The rule is no different with the FSIA. *See, e.g.*, *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1087-88 (9th Cir. 2007) ("In interpreting the FSIA, we first look to the plain meaning of the language employed by Congress." (internal quotation marks and citation omitted)); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 308 (9th Cir. 1997) (observing in an FSIA case that "[w]e assume . . . 'the ordinary meaning of [the statutory] language accurately expresses the legislative purpose' " (quoting *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1473 (9th Cir. 1995))). Thus, we take the plain meaning of the text to be the meaning that Congress intended. As the words and grammatical construct in § 1605(a)(3) are clear, we understand that Congress meant for jurisdiction to exist over claims against a foreign state whenever property that its instrumentality ends up claiming to own had been taken in violation of international law, so long as the instrumentality engages in a commercial activity in the United States.[10]

---

[10]The dissent invokes "another principle of statutory construction," dis. op. at 11500, which we disagree is applicable. It is that statutes in derogation of the common law are to be strictly construed. In the dissent's view, the common law gives sovereign nations like Spain a sovereign immunity. For this it relies on the Supreme Court's statement in *Samantar v. Youseuf*, 130 S. Ct. 2278 (2010), that "[t]he doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976." *Id.* at 2284. But the Court also made clear that "[a]fter the enactment of the FSIA, the Act — and not the pre-existing common law — indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Id.* at 2285.

Although the Foundation argues that evolution of the takings exception undermines this interpretation, it points to nothing in the legislative history which "clearly indicates that Congress meant something other than what it said." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (describing the standard) (internal quotation marks omitted). Instead, relying on two Fifth Circuit decisions, *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195, 204 (5th Cir. 1984), and *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985), and § 455 of the Restatement (Third), it claims that courts and commentators have long understood that the exception applies only to states that have done the taking. *Vencedora* was concerned with whether Algeria or an Algerian-owned corporation that had towed an abandoned vessel "owned or operated" it; in that context, the court stated that the legislative history of the FSIA indicates that § 1605(a)(3) was intended to reach any foreign agency that expropriated property or is using expropriated property taken by another branch of the foreign state. 730 F.2d at 204 (citing 1976 U.S.C.C.A.N. 6604, 6618).[11] The court held that

---

[11]The cited portion of the House Report explains the expropriation exception and states:

> (a)(3) Expropriation claims.— Section 1605(a)(3) would, in two categories of cases, deny immunity where "rights in property taken in violation of international law are in issue." The first category involves cases where the property in question or any property exchanged for such property is present in the United States, and where such presence is in connection with a commercial activity carried on in the United States by the foreign state, or political subdivision, agency or instrumentality of the foreign state. The second category is where the property, or any property exchanged for such property, is (I) owned or operated by an agency or instrumentality of a foreign state and (ii) that agency or instrumentality is engaged in a commercial activity in the United States. Under the second category, the property need not be present in connection with a commercial activity of the agency or instrumentality.

the Algerian-owned corporation did not assume control of the vessel for the benefit of the Algerian government. *Vencedora* thus speaks to a different issue; the court had no occasion to comment on whether the taker and the defendant must be the same. The statement upon which the Foundation relies does not, in any event, say the opposite; that is, it does not say that § 1605(a)(3) applies *only* to the state that has done the wrongful expropriating. *De Sanchez* does nothing more than quote *Vencedora*.[12] Neither persuades us that Congress clearly meant something other than what it said in § 1605(a)(3). Nor does the Restatement,[13] which paraphrases what the FSIA provides but sheds no light on congressional intent.

> The term "taken in violation of international law" would include the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law. It would also include takings which are arbitrary or discriminatory in nature. Since, however, this section deals solely with issues of immunity, it in no way affects existing law on the extent to which, if at all, the "act of state" doctrine may be applicable. See 22 U.S.C. 2370(e)(2).

H.R. Rep. No. 94-1487, at 19-20.

[12]It does so in explicating the so-called "Hickenlooper Exception" to the act of state doctrine. The "Hickenlooper Exception" is a shorthand reference to 22 U.S.C. § 2370(e)(2), which prohibited courts from declining on the ground of the act of state doctrine to determine the merits in cases where a claim to property is asserted based on a taking "by an act of that state in violation of the principles of international law." Whether or not § 1605(a)(3) was intended to parallel or incorporate the concepts of the Hickenlooper Exception, as the dissent suggests, the observation is inapposite because the act of state doctrine is *a substantive defense on the merits that is distinct from immunity. See Samantar*, 130 S. Ct. at 2290-91. Besides this, the Hickenlooper Exception shows that Congress knows how to write "*that* state" when it wants to.

[13]Section 455 provides:

> (3) Courts in the United States have jurisdiction with respect to claims to property taken by a foreign state in violation of international law if
>
> . . .

Our reading of the text is buttressed by the articulated purpose of the FSIA to immunize foreign states for their public, but not for their commercial, acts. As Congress declared: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." 28 U.S.C. § 1602 (Findings and Declaration of Purpose). Consistent with this purpose, § 1605(a)(3) restricts jurisdiction over an entity of a foreign state that owns property taken in violation of international law to those engaged in commercial activity in the United States. No other restriction is manifest.[14]

The Foundation asks us to compare § 1605(a)(3) with § 1605(a)(4), which is known as the "succession" exception,

---

> (b) the property (or the proceeds thereof) is owned or operated by an instrumentality of the state and that instrumentality is engaged in commercial activity in the United States.

Restatement (Third) § 455. The comment, upon which the Foundation also relies, states that

> the FSIA provides that if the property was taken by the foreign state in violation of international law, and if the property is . . . owned or operated by an instrumentality of the foreign state that is engaged in commercial activity in the United States, there is a sufficient basis for jurisdiction to adjudicate claims to the property.

[14]Nor does the literal language strike us as so absurd that Congress couldn't possibly have meant to provide a forum for adjudicating claims to property previously taken in violation of international law that is currently held by a different foreign state or its instrumentality, when the requisite nexus of commercial activity exists in the United States. Doing so is consistent with the familiar notion that a purchaser cannot get good title if property has been stolen at any place along the line, which is the general rule at common law. *See, e.g.*, Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork*, 23 Seattle U. L. Rev. 631, 633-34 (2000) ("[O]ne who purchases, no matter how innocently, from a thief, or all subsequent purchasers from the thief, acquires no title in the property. Title always remains with the true owner."); *see also* U.C.C. § 2-403 (seller can only transfer the title that it possesses).

and to follow how we construed that exception in *Republic of Philippines*, 309 F.3d at 1150-51. Section 1605(a)(4) exempts a foreign state from immunity in any case "in which rights in property in the United States acquired by succession . . . are in issue." As the Foundation points out, the word "acquired" is not followed by the phrase "by the foreign state," yet this is the meaning we gave to the exception in *Republic of Philippines*. In that case, creditors of the Estate of Ferdinand E. Marcos sought to collect Marcos assets held by Merrill Lynch; Merrill Lynch filed an interpleader action to resolve conflicting claims, naming, among possible claimants, the Republic of the Philippines. The Republic asserted sovereign immunity; the creditors relied on the succession exception even though the Republic had not acquired any right in the assets by succession. The creditors argued that jurisdiction nevertheless attached because the statute requires only that rights acquired by succession be in issue, not necessarily the rights of the sovereign. We concluded that the exception applies only when the foreign state's interest is as a successor to a private party. In so doing, we relied in part on legislative history which explains that immunity may not be claimed under this exception when the suit against the foreign state relates to property that it has obtained by gift or inheritance and that is located or administered in the country where suit is brought, because in this capacity — asserting rights in an estate — " 'the foreign state claims the same right which is enjoyed by private persons.' " *Id.* at 1151 (quoting H.R. Rep. No. 94-1487, at 20). In other words, to conform to the FSIA's declared purpose, we read § 1605(a)(4) as exempting a foreign state only if it were claiming rights as a successor because it is only in that role that it is acting like a private person. By contrast, § 1605(a)(3) on its face confers jurisdiction over a foreign state only if the foreign state that is sued claims to own illegally confiscated property *and* acts like a private person by engaging in a commercial activity in the United States. Section 1605(a)(3), therefore, is already consonant with the purpose of the FSIA.

Finally, the Foundation posits that bizarre consequences unintended by Congress will occur if § 1605(a)(3) is interpreted as granting jurisdiction against foreign entities regardless of who did the expropriating or when, and regardless of whether the defendant was a good faith purchaser.[15] We cannot say whether floodgates might open, but in any event, jurisdictional boundaries are for Congress to set, not for courts to write around. This said, restraints are in place that deflect the risk. The FSIA is purely jurisdictional; it doesn't speak to the merits or to possible defenses that may be raised to cut off stale claims or curtail liability. In addition, the statute constrains its own reach by restricting jurisdiction to rights in property, taken in violation of international law, that is now in the hands of a foreign state or its instrumentality, when that instrumentality is engaged in a commercial activity in the United States. And decisional law further limits the universe of potential claimants, for instance, by excluding nationals of the expropriating country from the scope of § 1605(a)(3). *See, e.g.*, *Siderman*, 965 F.2d at 711; *Chuidian*, 912 F.2d at 1105.[16]

---

[15]Whether Spain was a good faith purchaser is not, of course, before us. The bona fides of its acquisition will no doubt be raised in defense on the merits, but is not a factor in the jurisdictional calculus. Likewise, the dissent's concern that a taking by one country can waive the sovereign immunity of "some innocent nation that comes upon the property later through legitimate means," dis. op. at 11499, is premature. The Restatement sections upon which it relies speak to potential liability, not to immunity from suit. *See* Restatement (Second) of Foreign Relations Law of the United States §§ 164, 183 (1965); Restatement (Third) §§ 207, 712. They simply indicate that a state is responsible under international law for injury that is attributable to it or for which it failed to take reasonable preventive or punitive measures. But this case is not yet to the stage where these principles are in play.

[16]The dissent faults us for taking no heed of the fact that there may be "important diplomatic implications" of our decision. Dis. op. at 11496. However, this case involves a private dispute of the sort that Congress had in mind when enacting the FSIA. Moreover, as the Supreme Court recently explained, one of the two primary purposes described in § 1602 was "to transfer primary responsibility for deciding 'claims of foreign

**[6]** In sum, the statute states that the property at issue must have been "taken in violation of international law." It does not state "taken in violation of international law by the foreign state being sued." The legislative history does not clearly indicate that Congress meant something other than what it said. Indeed, the text would have to be redrafted to say what the Foundation wishes it said. For these reasons, we conclude that § 1605(a)(3) does not require that the foreign state against whom suit is brought be the foreign state that took the property at issue in violation of international law.[17]

### B

The Foundation maintains that its activities in the United States are *de minimis*, and lack the requisite connection to the property in question. It submits that the district court incorrectly held that the activity need not be "commercial" in the ordinary sense, or be related to the expropriated property, or be substantial.

**[7]** It is clear that activity need not be motivated by profit to be commercial for purposes of the FSIA. *Joseph v. Office of the Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987). As § 1603(d) provides, the commercial character of an activity depends on its nature rather than its purpose.

states to immunity' from the State Department to the courts." *Samantar*, 130 S. Ct. at 2285; *see also id.* at 2291 n.19 ("The Department sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities."). Although we could have invited a statement of interest from the State Department, as the dissent suggests, Spain itself did not seek one and manifested no interest at oral argument in soliciting the Department's views.

[17]This comports with what happened in *Altmann*. While we did not directly decide the issue, we allowed the suit to go forward against Austria and the government-owned Austrian Gallery though it was alleged that the Klimt paintings at issue in that case had been confiscated in part by German Nazis. *See* 317 F.3d at 968.

Thus, it does not matter that the Foundation's activities are undertaken on behalf of a non-profit museum to further its cultural mission. *See Sun v. Taiwan*, 201 F.3d 1105, 1107-08 (9th Cir. 2000) (holding that Taiwan's promotion and operation of a cultural tour was commercial activity despite being free and having been done to foster understanding). The important thing is that the actions are "the *type* of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted); *Siderman*, 965 F.2d at 708 ("The central question is 'whether the activity is of a kind in which a private party might engage.' " (quoting *Joseph*, 830 F.2d at 1024)).

**[8]** After allowing jurisdictional discovery on the issue, the district court found that the Foundation engages in commercial activities in the United States that include: buying books, posters, and post cards; purchasing books about Nazi expropriation of works of art; selling posters and books, and licensing reproductions of images; paying United States citizens to write for exhibit catalogs; shipping gift shop items to purchasers in the United States, including a poster of the Pissarro painting; recruiting writers and speakers to provide services at the museum; permitting a program to be filmed at the museum that included the Pissarro painting and was shown on Iberia Airlines flights between Spain and the United States; placing advertisements in magazines distributed in the United States, and sending press releases, brochures, and general information to Spain's tourism offices in the United States, at least one of which mentions the Pissarro by name; distributing the museum bulletin, "Perspectives," to individuals in the United States; borrowing and loaning artworks, though not the painting; and maintaining a website through which United States citizens sign up for newsletters, view the collection — including the Pissarro painting — and purchase advance admission tickets through links to third-party vendors. *Cas-*

*sirer*, 461 F. Supp. 2d at 1173-75. These findings are supported in the record and are not clearly erroneous.[18]

The Foundation faults the district court for having failed to require a nexus between the activity and the lawsuit, as well as a quantum of activity that has a substantial connection with the United States. It suggests that Congress meant to meld traditional concepts of personal jurisdiction with subject matter jurisdiction under the FSIA. However, the second clause of § 1605(a)(3) contains no requirement that a lawsuit arise out of specific activity having to do with the property in the United States, that is, there is no express analogue to the traditional doctrine of specific jurisdiction, nor does it explicitly require any particular level of activity or conduct commensurate to that normally contemplated for general jurisdiction. In this, § 1605(a)(3) differs from the "commercial activity" exception in § 1605(a)(2), which does provide that a foreign state is not immune from jurisdiction where "the action is based upon a commercial activity carried on in the United States by the foreign state" or upon an act committed elsewhere that "causes a direct effect in the United States." *See*, *e.g.*, *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1463 (9th Cir. 1995) (applying § 1605(a)(2) and indicating the focus for purposes of the "commercial activity" exception is on specific acts that form the basis of the suit). The difference between the two exceptions shows that Congress knew how to draw upon traditional notions of personal jurisdiction when it wanted to, and did.[19] Beyond this, the statute says nothing par-

---

[18]We have previously embraced a burden-shifting analysis under which the plaintiff has the initial burden of showing that an FSIA exception applies. If carried, the burden shifts to the defendant to show by a preponderance of the evidence that the exception does not apply. *See Siderman*, 965 F.2d at 707-08. The parties do not mention this framework, discuss its applicability to this part of the § 1603(a)(3) analysis, or argue that it affects the outcome in any way.

[19]The second clause of § 1605(a)(3) also differs from the first. The first clause, which pertains to commercial activities of the foreign state itself,

ticularly helpful about what constitutes "a" commercial activity that is either a "regular course of commercial conduct" or a "particular commercial transaction or act." Instead, Congress left it to the courts to flesh out on a case-by-case basis.

We have considered the question before. In *Siderman*, we concluded that the Sidermans' allegations concerning Argentina's solicitation and entertainment of American guests at an expropriated hotel and the hotel's acceptance of American credit cards and traveler's checks were sufficient at the jurisdictional stage to show that Argentina was engaged in a commercial activity in the United States. 965 F.2d at 712. In *Altmann*, we likewise held that the Gallery, which was an instrumentality of the Austrian government and owned the Klimt paintings allegedly confiscated from the plaintiff's family, engaged in a commercial activity in the United States. This was based on allegations (assumed to be true) that the Gallery authored, edited and published in the United States a book about the women in Klimt paintings and a guidebook with photographs of the stolen paintings; and it advertised Gallery exhibitions in this country. 317 F.3d at 969. The publication and sale of these materials, and marketing of a Klimt exhibition in the United States, were commercial activities in themselves, and also were a means of attracting Americans to the Gallery.

[9] Here, the Foundation has had many contacts with the United States, including some that encourage Americans to visit the museum where the Pissarro is featured, and some that relate to the painting itself. While the Foundation engaged in

requires that those activities be "carried on" in the United States. Section 1603(e) defines "commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United States." The second clause, applicable here, relates to a "commercial activity" in which an instrumentality of a foreign state engages, and is subject to the broader definition of "commercial activity" in § 1603(d), which does not mention "substantial contact."

somewhat more activity in the United States than sufficed in *Siderman* and somewhat less than occurred in *Altmann*, we cannot say its endeavors fall short of being a commercial activity for jurisdictional purposes under the second prong of § 1605(a)(3).

## C

Spain proposes that Cassirer was required to exhaust judicial remedies available in Germany or Spain before suing in the United States under the expropriation exception.[20] It particularly objects to the district court's use of the *exclusio unius* doctrine to infer from the presence of an exhaustion requirement in § 1605(a)(7) — enacted in 1996 — but the absence of one in § 1605(a)(3) — enacted in 1976 — that Congress intended *not* to include an exhaustion requirement in § 1605(a)(3).[21] We recognize that extrapolating congressional intent for an earlier-enacted statute from a later-enacted statute is problematic. *See, e.g.*, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 520 (1992) (questioning whether the intent of an earlier Congress can be inferred from the views of a subsequent one). We do not do so here; rather, we rely on the plain language of § 1605(a)(3) which contains no exhaustion requirement. This was the district court's primary conclusion, and it is one with which we agree.

[10] "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madi-*

---

[20]The Foundation makes no exhaustion argument, and does not join Spain's. Nor does the record disclose what remedies are available in either country.

[21]The requirement in former subsection (a)(7) was to arbitrate. Although not germane to our decision, we note that the arbitration requirement that was part of § 1605(a)(7) disappeared when that subsection was repealed, and reenacted in different form, in § 1605A. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083(b)(1)(A)(iii), 122 Stat. 3, 341 (2008) (repealing 28 U.S.C. § 1605(a)(7)).

*gan*, 503 U.S. 140, 144 (1992) (internal citations omitted), *superseded by statute on other grounds as stated in Booth v. Churner*, 532 U.S. 731, 739 (2001). The expropriation exception says nothing at all about exhaustion of remedies. It does not, for example, condition immunity on a claimant's having first presented his claim to the courts of the country being sued, or to the courts of the country that did the taking, or to any international tribunal. Spain identifies no language in the FSIA that would obligate Cassirer to exhaust. It follows that exhaustion is not a statutory prerequisite to jurisdiction.[22]

Neither does Spain point to anything in the legislative history that clearly indicates Congress meant to impose any such obligation. To the contrary, Congress intended to create a comprehensive, and exclusive, set of legal standards governing claims of immunity in every civil action against a foreign state.[23] As the preface to the House Report's section-by-

---

[22]The Court of Appeals for the D.C. Circuit has expressed its belief that "this is likely correct." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008). In that case it was unnecessary to decide the issue definitively as the remedy Russia identified was inadequate in any event. However, the court did observe that "nothing in § 1605(a)(3) suggests that plaintiff must exhaust foreign remedies before bringing suit in the United States." *Id.*

[23]The Supreme Court has often emphasized the importance of the comprehensiveness of this scheme in interpreting the FSIA. *See, e.g., Verlinden*, 461 U.S. at 488 (noting that Congress passed the FSIA with "a comprehensive set of legal standards" to free the government from case-by-case diplomatic pressures; to clarify the governing standards; and to assure litigants that decisions are made on purely legal grounds); *Altmann*, 541 U.S. at 699 ("Quite obviously, Congress' purposes in enacting such a comprehensive jurisdictional scheme would be frustrated if, in postenactment cases concerning preenactment conduct, courts were to continue to follow the same ambiguous and politically charged standards that the FSIA replaced." (internal quotation marks omitted)); *Weltover*, 504 U.S. at 610 (noting that the FSIA "establishes a comprehensive framework"); *Mesa v. California*, 489 U.S. 121, 136 (1989) (describing the FSIA as "a 'comprehensive scheme' comprising both pure jurisdictional provisions and federal law capable of supporting Art. III 'arising under' jurisdiction"

section analysis indicates, the FSIA "sets forth the *sole and exclusive standards* to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." H.R. Rep. No. 94-1487, at 12 (emphasis added). Further, the Report states, "[t]he purpose of the [FSIA] is to provide *when and how* parties can maintain a lawsuit against a foreign state . . . in the courts of the United States." *Id*. at 6 (emphasis added). These objectives would be undercut were courts to read requirements into the statute that Congress itself has not clearly prescribed.

Spain nevertheless commends us to the views on exhaustion in *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 782-84 (C.D. Cal. 1996); *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998); and Justice Breyer's concurrence in *Altmann*, 541 U.S. at 714. We are not, however, persuaded they are apposite.

*Greenpeace* involved seizure of a ship, and held that the claimant could not complain that a taking or other economic injury has not been fairly compensated — and so violates international law — unless the claimant had first exhausted domestic remedies in the foreign state that allegedly caused the injury. *Millicom* involved anti-competitive activity but relied on *Greenpeace* for the same rule. Cassirer's jurisdictional theory is different, however; he asserts that the taking was in violation of international law because it was part of Germany's genocide against Jews.[24]

---

(quoting *Verlinden*, 461 U.S. at 496)); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-38 (1989) (determining that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court, even if provisions of another jurisdictional statute might apply, and referring to the House Report, which indicates that the primary purpose of the Act was to "set[ ] forth comprehensive rules governing sovereign immunity," H.R. Rep. 94-1487, at 12).

[24]There can be no serious question this is a non-frivolous contention. *See*, *e.g.*, *Altmann*, 317 F.3d at 968 (assuming the facts as alleged were

*Altmann* is no more on point. The issue of exhaustion was not raised on appeal to our court and the Supreme Court did not grant certiorari on any issue other than whether the FSIA applied to claims that arose before it was enacted. The Court held that it did, rejecting the dissent's concern that doing so would open foreign nations to vast liability for expropriation claims that occurred long ago. Responding to the same concern, Justice Breyer mentions several principles that might prevent this from happening, among them, "a plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking."[25] 541 U.S. at 714. Justice Breyer's comment does not bear on the existence of mandatory statutory exhaustion for, as he says, an absence of remedies *may* need to be shown and a plaintiff who litigates

---

true, the Klimt paintings were "wrongfully and discriminatorily appropriated in violation of international law"); *see also Bernstein v. N.V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij,* 210 F.2d 375, 375-76 (2d Cir. 1954) (per curiam) (quoting State Department Press Release No. 296, April 27, 1949, entitled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers," that publishes an April 13, 1949, letter from Jack B. Tate, Acting Legal Advisor of the Department of State, reiterating the government's "opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls"; stating the government's "policy to undo the forced transfers"; and setting forth the policy of the executive branch with respect to claims asserted in the United States for restitution of such property, "to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials").

[25]As in *Greenpeace* and *Millicom*, this observation also has to do with a taking unaccompanied by just compensation. Justice Breyer draws on substantive Fifth Amendment law as set out in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999), and *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984), which requires exhaustion of postdeprivation remedies because there cannot be constitutional injury until a state fails to provide just compensation. However, a taking may violate international law when it does not serve a public purpose or is discriminatory in nature — the kind of taking that Cassirer has pled for purposes of jurisdiction in this case — as well as when it is not accompanied by just compensation.

in the United States in disregard of remedies in the expropriating nation "*may* have trouble showing a 'tak[ing] in violation of international law.' " *Id.* (quoting § 1605(a)(3)) (emphasis added). Thus, we do not read his concurrence as intimating that § 1605(a)(3) statutorily *mandates* exhaustion for jurisdiction to lie.[26]

This brings us to *Sarei v. Rio Tinto*, *PLC*, 550 F.3d 822 (9th Cir. 2008) (en banc), which was rendered after the district court's decision in this case and in which we discussed whether prudential exhaustion should apply to claims under the Alien Tort Statute (ATS).[27] There, residents of Papua New Guinea alleged various crimes against humanity and environmental torts arising out of Rio Tinto's mining operations in Papua New Guinea. Recognizing that the Supreme Court had signaled in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), that a prudential or judicially-imposed exhaustion requirement "would certainly" be considered in an appropriate case under the ATS, we held that *Sarei* was such a case. However, neither *Sosa* nor *Sarei* offers any basis for reading a mandatory exhaustion requirement into § 1605(a)(3). Both

---

[26]Spain and Justice Breyer additionally allude to comment *f* of § 713 of the Restatement (Third), which states that "[u]nder international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged." Restatement (Third) § 713 cmt. *f*. On its face this section applies only to claims by one state against another where interests of comity are most compelling. Section 1605(a)(3), by contrast, applies to claims by an individual against a foreign state of which he is not a citizen. But even if applicable to claims other than those by one state against another, and even if imbedded in international law, this section merely reflects "ordinary" practice. The FSIA does not incorporate it, and the legislative history doesn't mention it. In short, this source does not clearly indicate that Congress meant to require exhaustion even though it did not say so.

[27]The ATS confers jurisdiction on United States courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

the Supreme Court in *Sosa* and we in *Sarei* were discussing prudential, or discretionary, exhaustion, not statutory or mandatory exhaustion that may condition jurisdiction. Unlike statutory exhaustion, which, if clearly imposed by Congress, is mandatory and may also be jurisdictional, "[j]udicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather is 'one among related doctrines — including abstention, finality, and ripeness — that govern the timing of federal-court decisionmaking.' " *Sarei*, 550 F.3d at 828 (quoting *McCarthy*, 503 U.S. at 144).

For this reason, we do not consider whether exhaustion *may* apply to the claims asserted in this case. We have answered the question before us — whether Spain is entitled to sovereign immunity under the FSIA. Necessarily, to do so we had to decide whether exhaustion is a statutory prerequisite to jurisdiction. We have determined that it is not: the expropriation exception does not *mandate* exhaustion. The district court went no further, nor do we. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1088 (9th Cir. 2007) (deciding claim of tribal sovereign immunity on interlocutory appeal but declining to exercise jurisdiction over a claim based on denial of exhaustion of tribal remedies); *cf. Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 501 (1989) (rejecting immediate appeal from an interlocutory order denying a motion to dismiss based on a forum non conveniens clause because a claim that a party may only be sued in a particular forum is vindicable on appeal after final judgment).

**[11]** In conclusion, § 1605(a)(3) does not require local remedies to be exhausted before a court may determine whether subject matter jurisdiction exists, i.e., whether a foreign state is immune from suit. As the statutory criteria are met, the expropriation exception applies to Spain. We express no opinion beyond this. Undoubtedly, Spain and the Foundation will pursue numerous defenses, but these are beyond the scope of our present jurisdiction. We simply hold that the dis-

trict court has power to entertain Cassirer's claim against Spain as well as the Foundation.

## IV

### *Conclusion*

Having determined that our appellate jurisdiction does not extend to the district court's denial of motions to dismiss for lack of personal jurisdiction and a case or controversy, we dismiss the appeal as to these issues.

We conclude that Cassirer's suit falls within the "expropriation" exception to sovereign immunity, 28 U.S.C. § 1605(a)(3), which means that the courts of the United States have subject matter jurisdiction to entertain it. He has asserted a substantial and non-frivolous claim of a taking in violation of international law by Germany. We agree with the district court that Spain and the Foundation are not immune simply because neither was the taker. The Foundation, which claims to own the Pissarro that was taken from Cassirer's grandmother, has engaged in various activities in the United States — some of which relate to the painting and encourage Americans to visit the museum — that show a commercial activity for purposes of § 1605(a)(3).

[12] We also hold that § 1605(a)(3) does not mandate exhaustion of remedies as a prerequisite to jurisdiction. We decline to consider at this stage of proceedings whether prudential exhaustion may be invoked to affect when a decision on the merits may be made. Accordingly, we affirm the district court's order denying motions by Spain and the Foundation to dismiss for lack of subject matter jurisdiction.

DISMISSED IN PART; AFFIRMED IN PART.

GOULD, Circuit Judge, with whom KOZINSKI, Chief Judge, joins, dissenting:

I would reverse and remand with instructions for the district court to dismiss, on the theory that the Foreign Sovereign Immunities Act ("FSIA"), under 28 U.S.C. § 1605(a)(3), has not waived the sovereign immunity of Spain or its instrumentality the Foundation. Hence I respectfully dissent. I have misgivings because the genocidal regime of Nazi Germany renders Cassirer, as an heir with purported rights to a Pissaro painting stolen by the Nazis, a most sympathetic claimant. And I dissent with trepidation because the vast majority of judges on this panel of eleven would not reverse outright on the view that the sovereign immunity of Spain and its Foundation has not been waived by § 1605(a)(3) of the FSIA.[1] But two wrongs do not make a right, and, notwithstanding the Nazis' campaign of genocide against Jews and theft of their property, if Spain was not complicit in the Nazis' taking of the Pissaro,[2] I do not believe that our Congress would have

---

[1]One might ask, when there is such a firm supermajority for a position, what is the value of a dissent? The answer is that I pen this dissent to explain my views, because a dissent is a matter of individual judicial statement and individual judicial conscience. The majority's opinion is reasonable, even persuasive, but only within the limits it sets by invoking the plain-meaning rule. If the language was as plain to me as the majority perceives it to be, I would adopt a similar view and shrug off a concern that Congress has blundered. However, I view the language as ambiguous and I view traditional modes of statutory interpretation as pointing in a different direction, for the reasons that follow. These views may be considered by the bench of another court, by the interested bar, or by other interested persons.

[2]Although Franco was somewhat ambivalent in conduct relating to Fascist Germany and Fascist Italy, perhaps because of their help in Spain's Civil War, Franco's regime in Spain never supported Nazi persecution of Jews and, instead, Spain was a safe haven for Jews fleeing Nazi Germany or occupied France. Indeed it has been estimated that Franco's policies during World War II saved the lives of tens of thousands of European Jews. Chaim U. Lipschitz, *Franco, Spain, the Jews, and the Holocaust* 4 (1984).

intended its loss of sovereign immunity under the pertinent provision of the FSIA. Viewing § 1605(a)(3) as ambiguous, I conclude, all things considered, that it does not effectuate a waiver of sovereign immunity in this case as against Spain or the Foundation.

We start with the precise language of § 1605(a)(3):

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue . . . ."

28 U.S.C. § 1605(a)(3).

Where "the intent of Congress is clear and unambiguously expressed by the statutory language," no doubt the analysis ought to end there. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). The statute does not expressly say that the property must be taken "by the foreign state" (as Spain and the Foundation contend). But neither does the statute expressly say the property must be taken "by any foreign state" (as Cassirer contends). This lack of clarity is sufficient to conclude that the statute is ambiguous and subject to review of the legislative history for evidence of congressional intent. *See United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999); *see also Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.)*, 730 F.2d 195, 205 (5th Cir. 1984) (Higginbotham, J., concurring in part and dissenting in part) ("The FSIA presents a peculiarly twisted exercise in statutory draftsmanship. . . . Congress chose to make the exceptions in sections 1605-07 purposefully ambiguous, having decided to put their faith in the U.S. Courts, and thus attempted to provide only very modest guidance to the judiciary." (internal punctuation omitted)). In my view, the district court, our prior panel, and now our en banc panel are mistaken in their judgment thinking this statutory term unambiguous.

Prior to our en banc panel's decision today, it does not appear that any federal appellate court, apart from our prior panel whose opinion was taken en banc and is not precedent, has explicitly ruled on this issue. A few district-court decisions had previously agreed in approach with our prior panel's conclusion that the plain language does not require that the foreign-state defendant be the party that allegedly expropriated the property. These decisions, stressing the passive voice in § 1605(a)(3), as well as the prior panel opinion adopting this same line, are not persuasive to me. *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1202 (C.D. Cal. 2001), was conclusory. *Anderman v. Federal Republic of Austria*, 256 F. Supp. 2d 1098, 1109-10 (C.D. Cal. 2003), from the same district court, just cited it. Our prior panel's opinion was also summary in nature.

The en banc majority similarly concludes that the plain language of the statue decides this issue. Maj. op. at 11472-73. According to the majority, because the text of the statute is written in the passive voice, Congress would have to rewrite the statute to include the language "by the foreign state" in order to give it the meaning that Spain ascribes to it. *Id.* at 11473. Having decided that plain meaning dictates its result, the en banc majority then examines the legislative history but only to determine if it "clearly indicates that Congress meant something other than what it said." *Id.* at 11474 (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc)). That legislative history, according to the en banc majority, does not overcome the hurdle of plain meaning, because it in part emphasizes that a sovereign state's commercial activities lie outside its otherwise sovereign immunity. *Id.* at 11476-78. Because I do not think the meaning of the text is so plain, as Congress would similarly have to rewrite the statute to include the language "by any foreign state" in order to give it the meaning that Cassirer ascribes to it, and because I view the legislative history as dictating another result, the "plain meaning" does not in my view set such a high hurdle for the legislative history to overcome.

Several voices that should command our attention, and more respect than is given by the majority, have stated the view that the waiver provision of § 1605(a)(3) applies to the state that has wrongfully expropriated property in violation of international law. The Fifth Circuit, for example, has said that "the legislative history of the FSIA indicates that section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state." *Vencedora Oceanica*, 730 F.2d at 204. The D.C. Circuit has also recently said that § 1605(a)(3) "effectively requir[es] that the plaintiff assert a certain type of claim: that the defendant (or its predecessor) has taken the plaintiff's rights in property (or those of its predecessor in title) in violation of international law." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 941 (D.C. Cir. 2008). Although these statements might be viewed as in the nature of dicta because the issue that we face was not squarely confronted, I do not view these statements as misleading dicta; rather, they point us in the correct direction. This is the view presented in the American Law Institute's language in the *Restatement*, which also supports the interpretation that the defendant must be the foreign state that allegedly expropriated the property. Here is the *Restatement* of the ALI:

> [T]he FSIA provides that if the property was *taken by the foreign state* in violation of international law, and if the property is . . . owned or operated by an instrumentality *of the foreign state* that is engaged in commercial activity in the United States, there is a sufficient basis for jurisdiction to adjudicate claims to the property.

*Restatement (Third) of Foreign Relations Law of the United States* § 455 cmt. c (1987) (emphasis added).

I do not need to reach the proposed rationales that would turn decision on exhaustion.[3] Instead, we must first focus on whether Spain and the Foundation have taken property in violation of international law. Given that the statute is ambiguous, I would apply the usual tools of statutory construction and conclude that § 1605(a)(3) means that the property at issue must be taken in violation of international law by the foreign state defendant whose sovereign immunity shall be lost.

Considering the legislative history, the following points support my interpretation and that of the Fifth Circuit and D.C. Circuit in their dicta and the Restatement position: The FSIA incorporates the concepts of the "Hickenlooper Amendment," which provided in pertinent part that disputes over expropriated property were justiciable when rights in property were asserted on the basis of a taking "*by an act of that state in violation of the principles of international law.*" *See* 28 U.S.C. § 2370(e)(2) (1982) (emphasis added); *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985) ("Section 1605(a)(3) of the FSIA . . . parallels the so-called 'Hickenlooper Exception' to the act of state doctrine . . . . Like the Hickenlooper Exception, Section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality *that has nationalized or expropriated property without compensation*, or that is using expropriated property taken by another branch of the state." (quotation marks omitted and emphasis added)).

---

[3]If, contrary to my position, it were definitively decided that subject matter jurisdiction exists under the FSIA in so far as § 1605(a)(3) permits proceeding against any sovereign despite that the property was taken in violation of international law by a different sovereign, then I would conclude that exhaustion would be required by the statute, under § 1605(a)(3), as part and parcel of determining whether there had a been a taking in violation of international law. In this sense a requirement of exhaustion is embedded within the statute's exception for takings in violation of international law. However, believing that a waiver of sovereign immunity arises only as against a sovereign that took property in violation of international law, I do not have to reach this position.

"Congress intended the FSIA to be consistent with international law . . . ." *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation)*, 978 F.2d 493, 497-98 (9th Cir. 1992). The central premise of the FSIA is that "decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law." H.R. Rep. No. 94-1487, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613. Section 1605(a)(3) "is based upon the general presumption that states abide by international law and, hence, violations of international law are not 'sovereign' acts." *West v. Multibanco Comermex, S.A.*, 807 F.3d 820, 826 (9th Cir. 1987). When customary international law concludes that an act by a foreign state, that is, the taking of property in violation of international law, is no longer a sovereign act, the foreign state is no longer entitled to sovereign immunity. International law therefore supports the exercise of jurisdiction over foreign states that have themselves taken property in violation of international law; it does not support the exercise of jurisdiction over sovereign entities that have legitimately acquired property that was at some other time and by some other foreign state taken in violation of international law. To conclude otherwise would provide U.S. courts with unbridled jurisdiction over any sovereign foreign state that has in its possession property that was at one time taken in violation of international law by another foreign state. It would not matter if the expropriation occurred seventy years ago, as in this case, or seven hundred years ago. Congress would not have intended such a result.

The productive inquiry here is to ask what Congress intended by § 1605(a)(3), or, some might say, what Congress would have intended if the case presented had been expressly considered.[4] Because I do not believe that Congress would

_____

[4]Benjamin Cardozo in *The Nature of the Judicial Process* states:

The ascertainment of intention may be the least of a judge's troubles in ascribing meaning to a statute. "The fact is," says Gray in

have intended Spain to suffer loss of its sovereign immunity by this provision if it had no complicity in the unlawful taking, I do not join the position of the majority.[5]

Also, the majority takes no heed of the fact that there may be important diplomatic implications of its decision. Rather than asking the United States Department of Justice and United States Department of State to weigh in on the question whether the majority's statutory interpretation has diplomatic implications for the United States, the majority rushes headlong to give a procedural remedy to Cassirer. As I've said at the outset, Cassirer is a sympathetic claimant, being a victim of Nazi theft, yet that in itself is not sufficient to warrant a United States—led World Court approach, as the majority's position permits. U.S. foreign policy has rebuffed such a position, as the United States withdrew, with limited exceptions, from the International Court of Justice in 1986 and has not

---

his lectures on the "Nature and Sources of the Law," "that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present."

Benjamin N. Cardozo, *The Nature of the Judicial Process* 15 (Bibliolife 2009) (1921) (internal footnote omitted). A similar idea is expressed by Sir William Blackstone in his esteemed *Commentaries on the Laws of England*, where, in discussing "equity," he states:

For, since in laws all cases cannot be foreseen or expressed, it is necessary that, when the general decrees of the law come to be applied to particular cases, there should be somewhere a power vested of defining those circumstances, which (had they been foreseen) the legislator himself would have expressed."

William Blackstone, 1 *Commentaries on the Laws of England* 61 (1765).

[5]Congress, of course, could amend its language in § 1605(a)(3) to be explicit about whether it means to waive sovereign immunity of an innocent nation like Spain when it is in possession of a property taken by some other person or nation in violation of international law.

joined the International Criminal Court, which was founded in 2002. Sean D. Murphy, *Principles of International Law* 135 (2006); Jennifer Elsea, Congressional Research Service, Report for Congress, *U.S. Policy Regarding the International Criminal Court* 2 (Aug. 29, 2006).

The majority's view is not prudent unless sanctioned by the Department of State, and may be not prudent even if it had the State Department's approval.[6] There is no showing of any manifest need in justice to give Cassirer a forum in the United States for a free shot against Spain, for absent any prior attempt at exhaustion of remedies in Spanish courts, there is no showing that he would meet with a sovereign immunity barrier there.

Further, other maxims of statutory interpretation are persuasive contrary to the majority's interpretation. First, because there is ambiguity in interpretation, we should not adopt an interpretation that would violate the Constitution. *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002) (en banc) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality. . . . [I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." (citations omitted)). Here, Cassirer's due is to get the painting stolen by the Nazis or compensation for it. But Spain's due is to have its sovereignty and sovereign immunity respected because, as I first noted, two wrongs don't make a right. We

---

[6]The record does not show any statement of position on proper scope of § 1605(a)(3) to our court from the United States Department of Justice or the United States Department of State. I am not able to discern if the State Department is merely slumbering through this matter, or if, for its own purposes, it is studiously avoiding comment and maintaining a conscious silence at this stage of the case. However, in fairness to the State Department, and the Department of Justice, our court has not heretofore invited their comment on this issue.

should conclude that to strip Spain of its immunity because of a Nazi wrongdoing is a due process violation, because Spain is losing the sovereignty due to it with no showing or even allegation of complicity in wrong. In suggesting that there is a due process problem in the court's interpretation, I am seeing a procedural problem. As a matter of procedural due process, it is hard to see how we could suggest rationally that Spain should have to answer questions about whether Nazi Germany's taking of the painting, so many decades ago, offended international law. I am at a loss to understand how Spain could be expected to have any first-hand knowledge of what Nazi Germany did and why. Spain of course is aware of the general course of Nazi persecution of Jews, from the Nuremberg War Trials, but how can we say that Spain has any first-hand knowledge of Nazi Germany's taking of the Pissaro painting at issue here? If the majority interprets its jurisdictional grant under § 1605(a)(3) to be invoked when there is unconstitutional action of any person taking a property, no matter what country, no matter when, this puts an unreasonable procedural burden on a nation like Spain without knowledge of the events creating jurisdiction, and I think that is a procedural due process problem.

Second, it has long been understood that statutes should not be construed to violate the law of nations if any other interpretation is possible. *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). As stated by Chief Justice Marshall in that case:

> [A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

*Id.* at 118. It is my position that saying a taking by Nazi Germany in violation of international law waives the sovereign

immunity of some innocent nation that comes upon the property later through legitimate means is a position that would not be accepted under international law.[7] *See Restatement (Second) of Foreign Relations Law of the United States* § 164 (1965) ("A state is responsible under international law for injury to an alien caused by conduct *subject to its jurisdiction*, that is *attributable to the state* and wrongful under international law." (emphasis added); *id.* § 183 (explaining that a state is responsible under international law for injury to the property of an alien caused by conduct that is itself not attributable to the state if the injury resulted from the state not taking reasonable measures to prevent the conduct causing the injury or not reasonably attempting to impose a penalty on the person responsible for the conduct); *Restatement (Third) of Foreign Relations Law of the United States* § 207 ("A state is responsible for any violation of *its* obligations under international law . . . ." (emphasis added)); *id.* § 712 ("A state is responsible under international law for injury resulting from . . . a taking *by the state* of the property of a national of

---

[7]The majority contends that it is "premature" to consider whether Spain is a good faith purchaser. Maj. op. at 11478 n.15. Yet we must consider whether Congress intended to waive the sovereign immunity of such a good faith purchaser, since Cassirer does not allege in the complaint that Spain acquired the painting in bad faith or in violation of international law. Cassirer alleges at most that Spain has "wrongfully detained" the painting after the Nazis took the painting in violation of international law. Nor are we to rely simply on the allegations in the complaint to determine subject matter jurisdiction. We must instead look to facts outside the pleadings to determine whether we have jurisdiction. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) ("No presumptive truthfulness attaches to plaintiff's allegations. Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.") (citations omitted); *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."); Charles Alan Wright & Arthur R. Miller, 5B *Federal Practice and Procedure* § 1350 (3d ed. 2004). We know of no such facts in the record showing that Spain has itself taken the painting in violation of international law.

another state . . . .” (emphasis added)). As we stated recently in *Serra v. Lappin*, the principle from *The Schooner Charming Betsy* is only a tool to aid our search for congressional intent, because Congress, if it wanted to do so, could legislate beyond the limits of international law. 600 F.3d 1191, 1198 (9th Cir. 2010). As we explained in *Cabrera-Alvarez v. Gonzales*, “Congress has the power to legislate beyond the limits posed by international law.” 423 F.3d 1006, 1009 (9th Cir. 2005) (quotation marks omitted). The question is, in enacting § 1605(a)(3), did Congress mean to so infringe international law in its very provision finding violation of international law a basis for waiver of sovereign immunity?

There is still another principle of statutory construction that is applicable here. Specifically, we have sometimes recognized that statutes in derogation of the common law are to be strictly construed. *United States v. Texas*, 507 U.S. 529, 534 (1993) (“[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident”); *Grace Line, Inc. v. Todd Shipyards Corp.*, 500 F.2d 361, 371 (9th Cir. 1974) (“Any such rule of law, being in derogation of the common law, must be strictly construed, for no statute is to be construed as altering the common law, farther than its words import.” (quotation marks omitted)). We can say that the common law gives sovereign nations like Spain a sovereign immunity. The United States Supreme Court recently recognized this in *Samantar v. Yousuf*, where it stated, “The doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976.” 560 U.S. ___, No. 08-1555, slip op. at 4 (2010) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). When the FSIA establishes a comprehensive system for finding exceptions to sovereign immunity in its specified categories, thus outlining when sovereign immunity should be considered to have been waived permitting suit against foreign nations in the United States, these statutory exceptions to sovereign

immunity, being in derogation of common law, must be strictly construed, not expansively construed. If we give a strict construction to § 1605(a)(3), I think we logically would say that it is intended to cover violations of international law by the nation whose sovereignty is waived. But the majority, saying it covers violations of international law by anyone, is giving this provision, in derogation of the common law concept of sovereign immunity, an expansively unreasonable construction.

History and reason and comity all are allied in supporting that in this case Spain's sovereignty should be respected.

History tells us that nations have a sovereign immunity that has been broadly respected by other countries in their legal systems and in the system of international law. *See* Stacy Humes-Schulz, *Limiting Sovereign Immunity in the Age of Human Rights*, 21 Harv. Hum. Rts. J. 105, 109-10 (2008) ("State sovereignty and sovereign immunity fall into the category of customary international law . . . . [S]tates will generally accord other states immunity out of the belief that this is an unwritten but obligatory international rule."); Charles S. Rhyne, *International Law* 80 (1971) ("Corollary to a state's right of independence and equality is its immunity from suit in foreign courts by foreign nationals. . . . In most states, this immunity from suit remains an absolute privilege."); *see also Verlinden*, 461 U.S. at 486-88 ("For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country. [Even under the FSIA, a] foreign state is normally immune from the jurisdiction of federal and state courts . . . subject to a set of exceptions . . . .").

Reason tells us that § 1605(a)(3) should here be interpreted in a way that respects Spain's sovereign immunity. First and foremost, reason tells us that two wrongs don't make a right, so a Nazi taking in violation of international law cannot reasonably be viewed as invoking waiver of sovereign immunity

by a Spain that was not complicit in the taking. The language of the statute is ambiguous on its face, it does not say a taking by the foreign state, it does not say a taking by any one. Several important principles of statutory construction, that we shouldn't interpret this statute in a way violating our Constitution's Due Process Clause, that we shouldn't interpret this statute in a way violating international law, and that we should give strict construction to waivers of sovereign immunity because they are in derogation of common law, all support a more modest interpretation of § 1605(a)(3) than that advanced by the majority.

The principle of comity tells us the same thing. "Comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1067 (9th Cir. 2007) (quotation marks omitted). Thus it seems to me that because Spain is a sovereign with immunity from suit, we should respect that unless we have better reason than merely a deserving victim of Nazi aggression. Equally important, and I think a part of comity, is the common sense notion of the golden rule. We should not do to other nations what we would not want other nations to do to us. I am concerned that by indulging now the sympathetic claim of Cassirer as a Jewish heir with entitlement to priceless art stolen by Nazi Germany, but doing so at the cost of fairness to Spain and disrespect of its sovereignty, we will likely sow the seeds of maltreatment of the United States and its officials in foreign courts.

Hence, I respectfully dissent.